HEIRS of JOHN DAVID *v.* CITY OF NEW ORLEANS.—ADOLPHE LIVAUDAIS et al. *v.* the same.

The intention to dedicate to public use must be signified in a manner not liable to doubt or misconstruction, by something more than symbols of uncertain import or fanciful adornments with which it has pleased a draughtsman to decorate a plan of property. *Nemo facile præsumitur donare.*

Words indicative of an intention to give should be found on the plan in order to clothe it with such an effect. The public should accept the dedication by using the ground for the purposes indicated.

A market-house is not necessarily public property: it may be the object of individual ownership.

APPEAL from the Third District Court of New Orleans, *Duvigneaud, J.*
P. *Soulé & J. Seghers*, for plaintiffs. J. J. *Michel & Villeré*, for defendants and appellants.

BUCHANAN, J. In the year 1807 Livaudais and Robin, owners of two adjoining tracts of land above the city of New Orleans, fronting on the Mississippi river, laid out their land into squares of town lots, intersected by streets, under the name of Faubourg of the Annunciation, and offered the lots for sale, according to a plan made by Lafon, a civil engineer, deposited in the office of a notary public, with an act of deposit signed by them. The land embraced in this plan now constitutes a portion of the First District of the city of New Orleans. The plaintiffs in these two consolidated suits are the heirs of the original proprietors of the Faubourg Annunciation, Livaudais and Robin, and bring their petitory actions against the city, claiming two portions of ground of one hundred and twenty feet square each, situated, the one in square 93 and the other in square 94, of Lafon's plan of the Faubourg, at the junction of Melpomene street and Dryades avenue, (Cours des Dryades.) Those portions of ground have been taken possession of by the city, which has erected a market house upon the same, from which it derives a considerable revenue.

The defendant pleads in defence of the action, that the property claimed by plaintiffs is a public place, and part of a public highway; that the same was so designated in the original plan of the Faubourg; and by the acts of those under whom the plaintiffs claim title, the same was dedicated to public use forever.

It was admitted on trial, that the capacity of petitioners and their titles are as recited in the petition. It was also admitted, that on the property in dispute, there exists a public market; that said market was built by Patrick Irwin, by agreement with the Second Municipality; that the agreement was, that Irwin was to enjoy the revenue of said market for eight years; at the expiration of which time, he should deliver the market to the corporation, upon receiving one half of his original expenditure for the construction of the market; that this term has expired; that the city paid Mr. Irwin eight thousand dollars, or thereabout; and that plaintiffs notified the Second Municipality, at the time the market was erected, of their claim to be proprietors of the property now in dispute.

Under these pleadings and admissions, it is seen that the question is

purely and simply one of dedication to public use, as a highway or street. The evidence of such dedication is supposed, by defendant's counsel, to be found in certain dots or points, which, on Lafon's plan, extend in two parallel rows along the east side of Dryades avenue, until they reach, severally, a point in the squares 93 and 94, one hundred and twenty feet distant from Melpomene street; where the said row of dots diverge at right angles from the general line of Dryades avenue, to a distance of one hundred and twenty feet; and then, turning again at right angles, strike Melpomene street at the distance of one hundred and twenty feet from Dryades avenue. No words written upon the plan indicate the meaning of these recesses of one hundred and twenty feet square, in the adjacent corners of squares 93 and 94. Those recesses lie without the general line of the street upon which is written in the plan, "Cours des Dryades,"

Two civil engineers have been offered, by defendants, as witnesses to explain the meaning of the plan of Lafon, in reference to the dedication alleged. Those witnesses differ in their interpretation of the plan. One of them, L. H. Pilié, the city surveyor, testifies, that "he considers the piece of ground on which the market is built as part of Dryades street, for the reason that on Dryades street there are points indicating *trees*, and that that line of trees continued all around this piece of ground."

" His opinion is, that the piece of ground on which the market lies is part of the ' Cours des Dryades ' and of Melpomene street."

The other engineer, Mr. Buisson, "being asked if, from the plan before him, he could consider the space on which is built the Dryades market as being included in the ' Cours des Dryades,' answered, there is no such designation on the plan." "This piece of ground is not indicated on the plan as a public place, for want of the indications which the others have." (The witness had previously stated that there are but two public squares marked on the plan—the " Place de l'Annonciation" and the " Place du Marché.")

" Being asked if, by examining the plan, he could not declare that that portion of ground on which the market is built, is not a portion of the *Cours des Dryades*, he answered, there is no indication that it is."

In this conflict of the opinions of professional draftsmen and surveyors, would, we think, be unsafe to infer an intention on the part of the authors of the plan of the Faubourg Annunciation to create a public place at the junction of Melpomene and Dryades streets, composed of fractions of the adjacent squares Nos. 93 and 94, from the sole fact that a line of dots, probably representing trees, is depicted on the plan, as retreating from the general course of Dryades street at this particular point. The authorities upon the question of dedication of individual property to public use, seem to require something more definite and precise than the proof of dedication offered by the defendant in this case.

In another case of a similar character to this, growing out of the same plan of Lafon, Judge Martin held that evidence was inadmissible to show

the meaning attached by Livaudais to a word written upon this plan, ("Colisée") which was claimed as evidencing a dedication to public use. But in the present case no words are written upon that portion of the plan which represents the land now in dispute. That land is certainly out of the general lines of any street. It is not designated as a public square, or place; but we are called upon to declare it to be such; upon the strength of an ornamental border of dots or points, which may, or may not, have been intended to designate trees; for this is entirely conjectural; there being no evidence to show the meaning of the author of the plan; even supposing that such evidence could have been admitted under the ruling of Judge Martin, in the case in 16th Louisiana, above quoted. In the same case, page 513, the court says:

"There is no evidence of the alleged dedication, out of the plan in this "case; and none in the plan, out of the word 'Colisium.' In this same "plan is marked a locus publicus, called 'La place de l'Annonciation' in "the middle of which is a spot, designated as a place for a church."

The doctrine of the case quoted evidently is, that the intention to dedicate to public use must be signified in a manner not liable to doubt or misconstruction, by some thing more than symbols of uncertain import, or fanciful adornments with which it has pleased a draughtsman to decorate a plan of property. Nemo presumitur donare.

Again, in the great case of Municipality No. Two v. The Orleans Cotton-press Company, 18th Louisiana Reports, page 244, the organ of the majority of the court, in the decision rendered, laid down a clear and precise rule for testing a dedication to public use, to be inferred from a plan. The Court held that words indicative of an intention to give should be found on the plan, in order to clothe it with such an effect; and, moreover, that the public should have accepted the dedication by using the ground for the purposes indicated. The court assumed that words of dedication must have been used in the plan which was the subject of the decision of the Supreme Court of the United States, in the city of Cincinnati v. White's lessee, 6th Peters, 432, and quoted with approbation the following decision in that case.

"No particular form or ceremony is necessary in the dedication of land to public use. All that is required is the assent of the owner of the land, and the fact of its being used for the purposes intended by the appropriation."

Having examined already the form of the inferential grant or dedication in this case, let us next enquire what are the facts disclosed by the record in relation to the two essentials, under the high authorities just quoted; 1st, the assent of the owner of the land; 2d, the acceptance and use by the public according to the purposes of the dedication. Upon the first point it is admitted of record, that simultaneously with the first move on the part of the city authorities towards taking possession of the land in controversy, they were warned by the plaintiffs that the latter claimed the land as their property. And against this, there is no offer to show, as was done in the case of Sarpy v. Municipality No. Two, 9th Annual, 597, that the plain-

tiffs, or the authors of their title, had sold lots bounded by these prem-
ises as a public place.

Upon the second point there is no evidence that defendants ever used
the premises in contest as a public highway, the purpose to which their
answer alleges that they were dedicated. On the contrary, the first use
made of this land was, to lease it to an individual for the purpose of
building a market-house, of which the emoluments were received by the
lessee during the term of the lease, and subsequently by the corporation
as a branch of its revenues. A dedication to public use as a highway was
surely not fulfilled by converting this land into a site for a market.

In two cases, *David and Livaudais* v. *Municipality No. Two* decided
in December, 1853, and not reported, and in *The Heirs of Guillotte* v.
*The City of New Orleans*, decided in November, 1856, also not reported,
it was expressly held that a market-house is not necessarily public pro-
perty, but may be the object of individual ownership. It is a place to
which the public have free admission for the purpose of purchasing pro-
visions. But the right of selling them is not free to the public at large.
That right is usually reserved to a limited number, for a rent paid.

So far from being a public place, a market may be one of the most
profitable investments for capital, if we may judge from the market erect-
ed on this very land—a market which cost the city, as the evidence shows,
eight thousand dollars, and is now farmed out by the city at twelve
thousand five hundred dollars a year.

The original ownership of the land being established and admitted to
have been in the plaintiffs, it was incumbent on defendant to show, that
such ownership had been divested. This he has failed to do. The proof
does not make out either an original grant, or any act of plaintiffs, or of
their authors equivalent to a grant, of the *locus in quo*, for a public high-
way; neither is the assent of the owner of the land proved, nor the accep-
tance and use by the city for the purposes of the dedication pleaded by
them. We therefore conclude, that the evidence is insufficient to show
the dedication; and were this otherwise, the city forfeited the same by
misuser.

Judgment affirmed with costs.

MERRICK, C. J., dissenting. In the rear of Faubourg Annunciation,
as laid out by Robin and Livaudais, and forming the rear boundary of
the six squares numbered from 91 to 96 inclusive, was a long avenue
marked on the plan "Cours des Dryades," parallel with and not quite
so wide as the avenue marked on the same plan "Cours des Nayades."
These two avenues are the present Dryad and Naiad streets.

"The "Cours des Dryades" was marked on the plan as one single
public place; that is, it was entirely inclosed by black lines (except where
intersected by streets) and rows of dots within the lines, doubtless to in-
dicate trees.

At the point where it crossed Melpomene street it jutted out at right

angles so as to have an additional width of 120 feet the lines and rows of trees still continuing around the offset.

It had substantially this shape:

Four other streets besides Melpomene street, terminated in the "Cours des Dryades" and bounding the sides of the six squares above named.

Livaudais owned all one side of the centre of Melpomene street, and Robin the other side; and they laid out this avenue as well as the whole faubourg in concert. From an inspection of the plan it seems to me quite evident that the "Cours des Dryades" was one entire thing embracing everything enclosed within the lines and rows of dots. The fact that no part of it has been indicated in any other manner nor separated from the rest by any lines or marks of division whatever, and the whole being in the rear where the property was the least valuable, and two squares of ground which were intended for sale being disfigured in order to give les Cours des Dryades its present shape, connected with the fact that the sales were made with reference to this plan, is conclusive proof to my mind that Livaudais and Robin intended all the ground embraced in the figure surrounded by lines and trees or dots to become a *locus publicus*, a place common to all the inhabitants.

This faubourg was laid out in 1807. I therefore attach no importance to the claim made by the heirs of the original owners to this portion of "Cours des Dryades" *upwards of forty years* after it was laid out.

The property had doubtless all been sold long previous, and they had no further interest in maintaining the integrity of the plan. But when the property was owned by their ancestors the case was different. Their property could not have been sold to advantage without judiciously laying it out into streets, squares, public places, &c. And by laying out public places, they rendered the property more valuable in its vicinity. It being then the interest of the parties to dedicate portions thereof to public uses, and it being impossible for them to sell their lots for buildings and the purposes of a city, without streets, there is no room for the application of the maxim "*Nemo facile presumitur donare.*"

It does not appear to me to be just to allow parties who have derived all the advantage possible by sales under their plans, to gainsay the same when it is quite evident, that every purchaser in the neighborhood of this street must have supposed the "Cours des Dryades" was precisely what it purported to be on the plan; and those purchasing in the two irregular squares must have supposed they had fronts according to the same.

If the portion now in controversy does not belong to the public, then no part of Dryad street in this faubourg which has been used more than fifty years belongs to the city, but it is still the property of the plaintiffs. The argument which proves their right to one hundred and twenty feet proves their right to the whole. Neither is it of any consequence on what part of the entire figure its name was written. It is natural that it should be written where most convenient.

But some weight is placed upon the testimony of Mr. Buisson, the surveyor. This testimony is opposed by that of Mr. Pilié, the surveyor of the city, who says, that previous "to the building of the market the " space on which it now lies *was open free to use.* There was no line of " separation on the plan of Lafon between Dryades street and the space " occupied by the market"—that "he considered the piece of ground on " which the market is built as part of Dryades street, and gives as his " reason that on Dryades street there are points indicating this and the " line of trees continued all around the piece of ground." "His opinion " is that the piece of ground on which the market lies is part of the " Cours des Dryades and of Melpomene street."

But if the testimony of Mr. Buisson were not opposed by that of Mr. Pilié, it could not overthrow the original plan which we have before us. Where we have equal means of judging with others, and it is a question of construction, we cannot be controlled by the opinions of surveyors in any question arising under our laws. 16 L. R. 512. Opposed to this opinion of Mr. Buisson, as just observed, is the plan itself: the streets are marked as terminating in this avenue and one Melpomene at a point where the "Cours des Dryades" has its greatest width and that part which the judgment of this Court has given to the plaintiffs.

To each of the acts of deposit made by Robin and Livaudais of their surveys before the notary, is annexed written specifications or conditions called a "prospectus" to govern the respective rights of vendors and the purchasers. These acts refer to the Levee street and "Cours des Dryades," as I think, (and I use the term on the plan because it means more than street,) as boundaries of the faubourg.

Art. No. 5 in Robin's act after designating the prices of the front lots says: "those which follow to the 'Cours des Dryades' having the same " superficial quantity (as the preceding, viz, 7200 superficial feet,) should " be sold at the rate of one hundred dollars each." Now, here is an express recognition, that squares Nos. 91, 92, 93, 94, 95 and 96, as laid out, were bounded upon this Cours or avenue. Then, in another part of the same act he concedes for several years to the purchasers a common of

pasture and wood upon the unoccupied piece of ground "which is found comprised from le Cours des Dryades to the limits Jean Baptiste Macarty."

Livaudais in his "prospectus" annexed to his act offers for sale all the lots from the "Road which shall be established immediately behind the levee on the bank of the river Mississippi to the place known as the "Cours des Dryades," either by separate building lots or by squares, the whole according to the plan drawn by Mr. J. Bte. Lafon, engineer, which plan will be deposited with Mr. Pedesclaux" (the notary).

He also concedes the space from the rear of Dryades street to the Macarty plantation for a common, as Robin had done.

Now, what value can be attached to an opinion formed by a surveyor from an inspection of a map as opposed to the actual recognition by the parties of their dedication to public uses ?

But it is supposed that the designation upon the plan is not sufficient to show that it was intended as a dedication to the public, and certain authorities have been cited to show that such dedication cannot be presumed. The answer to this objection is this: Dryad Street is designated in precisely the same manner as Naïad Street, the name of which instead of being placed in the centre of the street, is written entirely on one side, and they are both recognized in the plans as the boundaries of squares, and as wide and important streets or parks, and both are marked with dots no doubt to indicate rows of trees.

The authorities cited so far from sustaining the pretentions of the plaintiff, in my opinion, show clearly that a designation such as has here been made in the plan of this faubourg is a dedication to the public use.

The case of *Livaudais* v. the *Second Municipality* has been cited.

In that case Judge Martin said that "there is no evidence of the alleged dedication *out* of the plan and none *in* the plan except the word "Coliseum." In the present case it has been shown that there is evidence both in and out of the plan of a dedication to public use. In the plan, because the squares on Dryad Street would not be squares, and the rear lots would not have any outlet, without the "Cours des Dryades." Out of the plan, because, in the acts of deposit the squares are shown to be bounded by the same, and were so offered for sale, and in the same manner the temporary common was bounded. According then to the authority of the Livaudais case, what was wanting in that case to prove the dedication to public uses, has been established in this.

In the Orleans Cotton Press case, 18 L. R. 122, 244, what was said was in relation to a batture in front of the Faubourg Delord, which Madame Delord retained in her possession, and portions of which she was constantly selling. What was so said must be understood in relation to the subject before the court. Surely that court did not mean to say that a plan in which streets were laid out and named and marked as such and such streets, would be an insufficient dedication to the public use because no explicit words of dedication had been used by the grantor !

The case of *McDonough* v. *Calloway et al.* seems to me to be precisely in

point. In that case the Court said: "*The dedication made by the plan,* HEIRS OF DAVID *and subsequently recognized in sales, is conclusive,* and must be binding NEW ORLEANS. upon the former owner of the ground, the title to a part of which is derived from him by plaintiff, who, in our opinion, is clearly entitled to the use and enjoyment of the alley or passage now claimed by the defendants as their property." 8 Rob. 92.

In the *De Armas* case, 5 L. R. 519, the Judges delivered opinions *seriatim,* and all that is said by Judge Matthews is, that "Squares or other spaces of land *appearing* to be left *vacant* in the plan of a town or city, are not (in my opinion) *in consequence of this fact alone,* to be considered as public places, and irrevocably dedicated to the use of the whole world. The plan *ought to contain something on its face* to show their destination and appropriation to such use, in order to imply a promise on the part of the original owner of the soil and founder of the city that they should always remain open for the use of the citizens and the public in general." 5 L. R. 219. If Livaudais and Robin did not intend this for the public use, why did they designate it as the Cours des Dryades in the same manner as they did the Cours des Nayades; and why were lines and continuous rows of trees marked around the entire figure, just as they were on the borders of all the wide streets upon the plan?

In the case of *City of Lafayette* v. *Holland,* this Court said: "It is well settled that no particular form or ceremony is necessary in the dedication to public use."

This Court then cites the case of *Rex* v. *Lloyd,* wherein Lord Ellenborough held that if the owner of the soil throws open a passage, and neither marks by any visible distinction, that he means to preserve all his rights over it, nor excludes persons from passing through by positive inhibition, he shall be presumed to have dedicated it to the public. 1 Camp. 262. The Court then remarks: "This may be considered as going very far, but the facts in this case create a stronger presumption than in that, and we think, make it certain. The Nuns exhibit a plan of their property, upon which a street called *Levee street* is exhibited running parallel with the levee, and according to defendant's statements, but a few feet from it. No specific feet are marked on the plan, as exhibiting its width. *On each side, close* to the front of the lots and to the levee, *lines are drawn which seem to represent sidewalks,* and the same *lines are drawn* on all the other streets on the plan. The object of the Nuns in subdividing their property was to convert it into town lots, with a view to its becoming an addition to the city of New Orleans, to which it was finally annexed under the name of one of the unincorporated faubourgs."

The Court concluded by holding all the space between the street and the levee as public. Here full effect was given to the plan, as in the McDonough case.

The doctrine of the Supreme Court of the United States is similar, and not less liberal than our own. In the case of *The City of Cincinnati* v. *White,* 6 Peters, 435, that court, distinguishing this class of cases from private grants, where there must be a grantor and grantee, said: "But that

is not the light in which this court has considered such dedications for public use. The law applies to them rules adapted to the nature and circumstances of the case, and to carry into execution the intention and object of the grantor; *and to secure the public the benefit held out and expected to be derived from and enjoyed by the dedication.*"

In another case, *Barclay* v. *Howell's Lessee*, 6 Peters, 499, it was held, in reference to the plan of the town of Pittsburg, that although Water street was not marked upon the plan as the other streets, yet, as the surveyor had declared that it did extend to the river, and as property was bought and sold in reference to it, and as there were no lines marked on the plan in conflict with it, and the public had used it for thirty years, there was sufficient evidence of dedication to the public. See also *New Orleans* v. *The United States*, 10 Peters, 662.

In cases like the present, there is still a stronger argument which may be rendered available, and which is shadowed out in the extract from the Cincinnati case, viz., that the parties who have sold by reference to plans are estopped by their conduct, which has induced others to buy upon the faith of their representations, from controverting the same. Wide streets and avenues and open spaces, as already observed, enhance greatly the urban property in their vicinity. It is unjust, then, to permit parties who have by means of such plans, obtained the highest price for their property, and who have for a full value delivered it into other hands, to attempt to defeat the rights of the grantees by withholding from their use that which was known to be an important inducement to purchase. See *Marsh* v. *Smith*, 5 Rob. 523. In such cases, what is taken for streets, markets and public places, is more than paid for in the enhanced price of that remaining.

Having thus, as I think, shown that Dryad street was dedicated to the public use, and that the plaintiffs, who sold and offered their property for sale with reference to it, are estopped by their acts from withdrawing any part from the public, I will now consider, in a few words, whether there is any ground for dismembering the "Cours des Dryades" as laid out in the plan, or any reason to add to squares 93 and 94 what was purposely excluded by the original grantors.

The term "le cours" is not strictly an appropriate designation for a street. It is quite as appropriate for a place having the shape marked upon the plan as the "Cours des Dryades" as it is for a street. Cours is defined to be a "promenade; a ring; a place where persons of quality resort to take an airing in their coaches, such as Hyde Park." By the Dictionary of the Academy, "An agreeable place, destined or chosen ordinarily near great cities to take airings in carriages."

It is, then, quite apparent that when this designation was given this place, it was intended it should be surrounded by trees, as shown by the plan and implied by the names "Cours" and "Dryades;" and as the park was narrower than the "Cours des Nayades," it was important that it should be enlarged at some points for the convenience of the public.

Again, the plaintiffs recognize in their petition, both Dryad and Mel-

pomene streets. Then it is thus conceded, that Robin and Livaudais dedicated to the public use all that portion marked Cours des Dryades, except the offset near the Melpomene street. We have seen what importance is attached to the lines upon the plans in the Pittsburg case and the McDonough case. Now, Melpomone street by the plan is made to terminate at the "Cours des Dryades," and if the one hundred and twenty feet claimed, were intended to be private property, then it ought to have been crossed by Melpomene street. But if dedicated to the public use, then it was sufficient to terminate the street where it did terminate.

Again, the offset in the Cours des Dryades left squares 93 and 94, which were also entirely closed by black lines, irregular in shape, yet they were so offered for sale, and sales were, shortly after the plan was executed, made under the same.

Here, then, we have the plan, *which clearly incloses the locus in quo as a part of Cours des Dryades;* we have the recognition of this public place, a promenade or park, in the acts of deposit or dedication; *the squares are made to conform to it;* streets terminate at its limits, connecting with it; property is sold by it; it has always, as well as the street itself, been open for the public use, and it was, *forty-two years* after its dedication to the public use, before any adverse pretentions were made by the original grantors or their descendants, and now, when this property, and property in its vicinity, has become valuable by establishing a market, and more than half a century has elapsed since the original dedication was made, this present action has been instituted.

Again, it is said that the city (if the dedication be conceded) has forfeited its right to this portion of the Cours des Dryades by misuser.

The reply to this conclusion is, that this issue is not raised by the pleadings or the proof. The plaintiffs claim in their petition the property as owners who have never parted with it. The defendant, in his answer, alleges that the *locus in quo* is part of a highway, and a public place, and was so designated in the original plan, and was dedicated to the public use forever. With this issue before us, I am at a loss to understand how the question can be raised as to a forfeiture by misuser. That would require an admission on the part of the plaintiffs that their authors had parted with the ownership, and dedicated the "Cours des Dryades" to public use, which they now deny. Moreover, as the plaintiffs have doubtless long since divested themselves of the ownership of these lots upon Dryad street, they have but little interest in the question as to the mode in which this public place is used.

It is the duty of the city to prevent obstructions to the public streets, but I am not aware of any law which declares the forfeiture of a *locus publicus* because a market has been erected upon it. The very fact that it is a *locus publicus*, gives any one interested, as well as the city, the right to cause obstructions to be removed. See *Shepherd* v. *Municipality No. 3,* 6 Rob. 349.

## SAME CASE.—ON A RE-HEARING.

BUCHANAN, J. For the reasons given in the opinion of the Court heretofore read, it is ordered, adjudged and decreed, that the judgment herein pronounced on the 26th March, 1860, remain undisturbed.

MERRICK, C. J. I adhere to my former opinion.