**(113 So. 748)**

**No. 28289.**

**DOIRON et al. v. VACUUM OIL CO. et al.**

Feb. 28, 1927.

Rehearing Denied July 11, 1927.

*(Syllabus by Editorial Staff.)*

**1. Appeal and error ⬤⟿1119—Motion by party not perfecting appeal to reserve her rights, whatever judgment may be as to remaining parties, to enable her to later prosecute appeal, will not be granted.**

Motion by party who has not perfected appeal to reserve her rights, whatever judgment may be as to remaining parties to suit, to enable her at some later date to prosecute appeal or litigate case anew because she has not decided whether to appeal, or has not made arrangements to do so, will not be granted, since remaining parties to appeal have right to have appeal disposed of as against all parties to it at earliest practical moment.

**2. Marriage ⬤⟿40(11)—Burden was on plaintiffs, alleging marriage was contracted, to establish that it was.**

In suit to establish title to land in which plaintiffs alleged that ancestor through whom they claimed was married, burden was on plaintiffs to establish marriage.

**3. Marriage ⬤⟿50(1)—Evidence held not to establish marriage of couple, who, at commencement of relations, lived in concubinage.**

In suit to establish title in which plaintiffs claimed title as heirs, evidence *held* not to establish marriage of ancestor through whom they claimed, where she and claimed husband had at commencement of relations lived in concubinage.

**4. Marriage ⬤⟿40(4)—Illicit relation of couple living together is presumed to have continued until contrary is made to appear.**

Illicit relation so long as couple lived together is presumed to have continued until contrary is made to appear.

**5. Marriage ⬤⟿40(4)—"Reputation," to give rise to presumption of marriage, must be general and consistent.**

"Reputation," to give rise to presumption of marriage, although coupled with evidence showing long cohabitation, must be general and consistent, and fact that some in community regarded couple as married, while others did not, did not create presumption of marriage.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Reputation.]

**6. Evidence ⬤⟿81 — Where marriage laws of Canada are not shown, it is presumed that they were same as laws of state at time marriage was contracted.**

Where marriage laws of Canada where marriage was contracted were not shown, it is presumed that laws were same as those of state at the time marriage was contracted.

**7. Evidence ⬤⟿183(1)—Where law at time of marriage did not require license, parol evidence was admissible to establish marriage without showing loss of primary evidence.**

Where laws of state at time of marriage did not require license and an act or return signed by parties and witnesses, and law of place where marriage took place was presumed to be same as those of state, parol evidence was admissible to establish marriage without showing loss or destruction of primary evidence.

**8. Marriage ⬤⟿50(1)—Evidence held sufficient to show valid marriage in another country.**

In suit to establish title to land in which defendant claimed title as collateral heir, evidence *held* to establish marriage, in Canada, of defendant's parents.

**9. Marriage ⬤⟿49—Parol evidence held admissible to establish common-law marriage in another state.**

Parol evidence *held* admissible to establish common-law marriage in New York.

O'Niell, C. J., dissenting in part.

Appeal from Fourteenth Judicial District Court, Parish of Calcasieu; Thomas F. Porter, Jr., Judge.

Suit by Rosamond Doiron and others against the Vacuum Oil Company and others. From the judgment, plaintiffs appeal. Affirmed.

Robert R. Stone, of Lake Charles, and Donelson Caffery, of New Orleans, for appellants.

Cline & Plauche, of Lake Charles, William A. Vinson, of Houston, Tex., McCoy & Moss, A. O. King, and E. R. Kaufman, all of Lake Charles, for appellees.

OVERTON, J. This is a suit in which plaintiffs pray to be decreed to be the owners of 80 acres of land, located in the Lockport oil field, in Calcasieu parish. The field in which the property is situated is one of those recently discovered in this state. The land, not many months ago, was deemed to be worth but little, but is now of great value because of the probability that oil exists in paying quantities beneath its surface.

Plaintiffs allege title to the entire tract by setting forth that they are the heirs of Leonise Verdine; that she was the wife of Riley A. Brusseau; that Brusseau on November 20, 1882, during the existence of the marriage between him and his wife, purchased the property, involved herein, at tax sale, for taxes levied against it for the years 1878, 1880, and 1881, on assessments made in the name of O. B. Bouchel, as owner, as appears from the tax sale of the property, duly recorded in the conveyance records of Calcasieu parish; that as the property was acquired by Brusseau, during his marriage, it was community property, one half of which belonged to Brusseau, and the remaining half to his wife, Leonise Verdine; that, as Brusseau died about 1887, without leaving descendants, ascendants, or other relations, Leonise Verdine, as his widow, inherited his half of the property; and that, as she, after having thus acquired the entire tract, died without descendants or ascendants, the property passed at her death to her nearest collateral relations, and that they, plaintiffs, as her nearest kin, or as the descendants of such of them as are deceased, inherited the entire tract.

Plaintiffs' claim to the tract in its entirety, as above outlined, is endangered, as to 40 acres of the property, by the fact that one half of the land, in 1884, during Brusseau's lifetime, was sold at tax sale to J. B. Watkins, now deceased, for taxes, which the authorities claimed were due by Brusseau on the whole tract, but plaintiffs meet the situation by which their claim to the entire tract is endangered by alleging that the tax sale is null, and by alleging that Watkins, soon after his purchase, abandoned whatever title he may have acquired by virtue of the sale to him.

Plaintiffs allege that no one is in the actual physical possession of the property sued for by them, and hence allege that they have a right to assert their claims in an action to establish title, instituted under Act 38 of 1908. They make defendants in the suit those representing themselves to be the nearest collateral relations of Brusseau and to be his legal heirs. They also make defendants in the case those who claim to be the heirs of Watkins, and all others who claim an interest adverse to them by conveyances from those who assert that they are the heirs of either Brusseau or of Watkins. They also make Mrs. Onezima De Bouchel, who is the only child of O. B. Bouchel or O. De Bouchel, deceased, who was the owner of the land, claimed by plaintiffs, at the time the tax sale was made to Brusseau, a party defendant, and plead against any attempt on her part to annul the tax sale, the prescription or preemption of three years. The prayer of the petition is that plaintiffs be decreed to be the owners of the property and be sent into possession thereof.

Mrs. Onezima De Bouchel answered this demand by denying that plaintiffs are the owners of the land described in their petition; by averring that she, as the sole heir of her father, Onezime De Bouchel, and of her mother, Helen Crooks, is the owner of the property; by averring that her father entered it from the state of Louisiana in 1877; by denying that the land was ever forfeited for the nonpayment of taxes or that there was ever any tax sale or other conveyance of the property by which Onezime De Bouchel or O. B. Bouchel was divested of title, and by which Brusseau or any one else acquired

title; and by averring that J. B. Watkins lost by abandonment whatever title he may have acquired to a part of the land. Her prayer is that she be decreed to be the owner of the entire tract.

The remaining defendants, either through their attorneys or their curators ad hoc, filed answers to plaintiffs' demand. They deny that Leonise Verdine and Brusseau were ever married, and hence deny that Leonise acquired any part of the property under the laws relating to the community of acquets and gains by virtue of Brusseau's purchase, or that she acquired, when Brusseau died, any part of the property by inheritance as his widow. All of these defendants assert the validity of the alleged tax sale to Brusseau, and plead the prescription of three years in support of it, and all of them; who claim an interest in the property through J. B. Watkins, aver the validity of the tax sale to him of one-half of the property, deny that he abandoned his title, and plead in support of the tax sale the prescription of three years. Those of the defendants, who plaintiffs allege claim to be the heirs of Brusseau, aver that they are his heirs, but concede, in effect, through their curator ad hoc, that they have transferred to the Vacuum Oil Company all of their interests in the land, save certain mineral rights. The Vacuum Oil Company contends that it has acquired the entire tract from the heirs of Brusseau, and, in addition to this title, avers that it has acquired the interests of nearly all of the heirs of Watkins in the one-half of the land purchased by him at the tax sale from Brusseau, as tax debtor.

These defendants; with the exception of those claiming to be the heirs of Brusseau, pray substantially that plaintiffs' demand be rejected. Those claiming to be the heirs of Brusseau, in addition to this prayer, in view of the transfers made by them to the Vacuum Oil Company, also pray that that company be decreed to be the owner of the land, subject to certain mineral rights which they claim.

The case was tried twice before the court without a jury. The efforts of all the defendants were directed towards the defeat of plaintiffs' demand. Their efforts, excepting, of course, those of Mrs. De Bouchel in which defendants were joined by plaintiffs, were also directed towards the defeat of Mrs. De Bouchel's demand to be decreed the owner of the entire tract. Save as here indicated, there appears to have been no contest on either trial among the numerous defendants herein, though the various pleadings on their faces suggest that conflicting interests exist. Each trial resulted in a judgment rejecting the demand of plaintiffs as well as the demand of Mrs. De Bouchel.

From the judgment rendered plaintiffs alone have appealed. Mrs. De Bouchel moved for and obtained an order of appeal, but failed to perfect the appeal granted her, by furnishing the required bond. No answers to the appeal have been filed, but Mrs. De Bouchel, through her counsel, has filed a motion in this court, setting forth that she has serious grounds of complaint to urge against the judgment rendered below rejecting her demand to be decreed the owner of the property in controversy, and since she has a year from August 11, 1926, this being February, 1927, to appeal, she prays that her rights be protected and reserved, whatever the judgment may be on this appeal, as between the remaining parties to the suit. This motion we shall consider later.

The issues disclosed by the record, which this court may find it necessary to consider, as outlined by both plaintiffs and defendants, excepting Mrs. De Bouchel, who filed no brief, are as follows:

"(1) Did Riley A. Brusseau acquire a good title to the property in question by virtue of the tax sale dated December 16, 1882, thereby divesting the ancestors of Mrs. Onezima De Bouchel of title thereto?

"(2) Were Riley A. Brusseau and Leonise Verdine ever married? ·

"(3) If it be held that they were in fact married, did this marriage take place before or after the acquisition of this property by Brusseau on December 16, 1882, so as to fix its status as community property?

"(4) If it be held that there was in fact a marriage, and that it occurred prior to December 16, 1882, then did Riley A. Brusseau leave any collateral relations who inherited his community interest in said property?

"(5) Did Jabez B. Watkins acquire a valid title to the west 40 acres of said property by the tax sale to him in the name of Riley A. Brusseau, dated April 4, 1885, and did this title vest in his heirs from whom the Vacuum Oil Company acquired title?"

The first proposition stated, it may be said, is presented only in the event we should conclude, under existing circumstances, that we ought to pass upon it; it being urged that we should not. That proposition was necessarily an important one in the trial court, and would have been so here had Mrs. De Bouchel perfected her appeal from the judgment, rejecting her demand to be recognized as the owner of the land in controversy. However, she has not perfected the appeal and is before the court merely as an appellee. She is the only party to the suit who has an interest in maintaining the proposition that her father was not divested of title by that sale. All of the remaining parties to the suit urge that he was so divested, and many of them, including the plaintiffs and the Vacuum Oil Company, are directly interested in maintaining that he was thereby divested of title. Mrs. De Bouchel has not even answered the appeal by praying that the judgment in so far as it is against her be amended by recognizing her as the owner of the property, assuming that a prayer for such an amendment could be entertained, in a case such as this, where the amendment, if decreed, would alter the judgment as between appellees. The only reason that can be urged for passing on the question presented by the first proposition is to determine whether or not Mrs. De Bouchel is the owner of the property, and since we cannot enter a decree, on this appeal, that she is, it would serve no purpose to consider the question here. In other words, at least, for the purposes of this appeal, we must treat the case as if Mrs. De Bouchel's father was divested of title by that sale.

[1] Counsel for Mrs. De Bouchel evidently fear that the foregoing is true, and hence present the motion in behalf of their client, referred to above, praying that we reserve her rights, whatever our judgment may be, as to the remaining parties to the suit, and the question is therefore presented whether we should grant the reservation requested. In our opinion, we should not. The remaining parties to the appeal, whether appellants or appellees, have the right to have the appeal disposed of, as against all parties to it, at the earliest practical moment, so far as this may be lawfully done. Those who desire to appeal should not be required to wait until one of their opponents determines whether he desires to appeal, or until he can make arrangements to do so, and those who have gone to the expense of appealing cannot be deprived of the benefits of their appeal, even in part, by the reservation of the rights of one of the appellees to enable such appellee at some later date to prosecute the appeal or litigate the case anew, merely because the appellee has not decided whether to appeal or has not made arrangements to do so. We therefore think that the motion filed by Mrs. De Bouchel should not be granted. Hence it follows that the judgment to be rendered herein must have such effect, as against Mrs. De Bouchel, as the law may attach to it. Whatever that effect may be it is unnecessary to determine here. Suffice it to say that we have no alternative here but to consider the case as if Mrs. De Bouchel's father was divested of title by that sale.

The next question to be considered is whether Brusseau and Leonise Verdine were

ever married. If they were not it follows that no community of acquets and gains existed between them, and hence that Leonise did not acquire a half interest in the property in controversy here, as a member of such a community, when Brusseau purchased it, and since it does not appear that Brusseau and Leonise were related to each other, it also follows that, if they were not husband and wife, Leonise did not inherit from him, whether or not, upon his death in 1887, he left collateral relations and hence that she inherited no interest in the land, and therefore had none therein to transmit to plaintiffs, or those from whom they claim to inherit, upon her death in 1896. The question to be here considered is therefore one of vital importance in this case.

Brusseau was born in St. Lawrence county, in the state of New York. He was of the Caucasian race, and served in the Civil War. About the year 1877, he left the state of Iowa, to which he had removed, and went to Calcasieu parish, in this state, where he established his domicile. He there met Leonise Verdine, an unmarried woman, who was partly Indian, partly Caucasian, and possibly had some negro blood in her veins. The Indian blood in her seemed to predominate, which gave her somewhat the appearance of an Indian.

Brusseau's acquaintanceship with Leonise became intimate, and in the course of time they lived together in open concubinage. This fact is not disputed. It is contended, however, that, after they had lived in concubinage for some months, they were married, and that the marriage took place prior to Brusseau's purchase of the land in controversy. If they were married, all written evidence of the marriage was destroyed by fire some years ago, when the courthouse and Catholic Church at Lake Charles were burned, and when the home of a relative, near Lockport, where Leonise was residing, and where she is supposed to have had a duplicate of the marriage certificate, was consumed by fire.

Plaintiffs, being without written evidence of the marriage which they claim was celebrated, have sought to establish it by secondary evidence. The evidence introduced by both plaintiffs and defendants, touching this phase of the case, covers by far the greater part of five volumes. To attempt here to analyze it fully is not only unnecessary, but impracticable. It may be said, however, that all of the evidence has been carefully considered.

The only witness who claims to have witnessed the marriage ceremony was Frank Ozan, a relative of some fifteen of the plaintiffs. Ozan testified that he was living in the same house with Brusseau and Leonise, and had been living there for seven or eight months, when one day in the early 80's he was requested by Brusseau to row him and Leonise across Lake Prien. He testified that he did so, and that when they reached the opposite side they went to the home of Father Cuni, a Catholic priest, where they found several others besides the priest, whose names he does not recall; that Brusseau presented to Father Cuni a marriage license; that Father Cuni then performed the marriage ceremony; and that he and two others, whom he does not recall, signed the marriage certificate as witnesses, he attesting the certificate by making his mark.

The trial judge, after a careful consideration of the evidence of this witness, concluded to give it no weight, as appears from the opinions rendered by him on both trials of the case. One of the reasons assigned by our learned Brother why he disbelieved the witness is the apparent facility with which the witness, after a lapse of 45 years, testified to minor details concerning the wedding, as to which there was little or no opportunity to contradict him, and yet, when it came to

matters which might be reasonably expected to afford some opportunity for contradiction, such as giving the names of those who were present at the wedding and of those who, as witnesses, signed the marriage certificate with him, he testified that he was unable to recall a single one. While this circumstance is by no means conclusive as to the credibility of the witness, yet it is entitled to weight in passing upon that question. The lower court was also not satisfied with the evidence of the witness in other respects. Our examination of the witness' evidence does not lead us to the conclusion that the trial judge erred in refusing to attach weight to it.

Plaintiffs also introduced evidence to show that Leonise had in her possession a certificate showing that she and Brusseau were married. Some of these witnesses testified that she had the certificate framed and hung it on a wall in a room in her home, and pointed it out to them, telling them that it was her marriage certificate. Others testified that she hung the certificate on the wall for a while and later kept it in a trunk from which she took it occasionally to show to her friends. Those who saw what is said to have been the certificate do not appear to have read it, but apparently testify from what Leonise told them it was. The evidence as a whole fails to show that Leonise had a marriage certificate.

Evidence was also introduced to show that both Brusseau and Leonise told others that they were married. The evidence, we think, shows that Leonise made statements to the effect that she and Brusseau were married, but it also appears that she also told at least one person who was close to her that they were not married. Brusseau, it appears, also stated on several occasions that he and Leonise were husband and wife, but he also told others during the same period that they were not.

In view of the fact that both parties made inconsistent statements regarding their sta-tus, we think, as did the trial judge, that no inference can be drawn from this evidence favorable to the position taken by plaintiffs that the marriage was, in fact, contracted. See Powers v. Charbmury's Ex'rs, 35 La. Ann. 630.

Considerable evidence was offered to show whether Brusseau and Leonise enjoyed the reputation of being husband and wife in the community in which they lived. The evidence is conflicting on this point. While there is evidence to the effect that they were regarded as being married, yet there is evidence to the contrary. Some witnesses of high repute, who were in position to know the views of the community, testify to the effect that Brusseau and Leonise were not regarded as being married, but as living together in open concubinage. The most that can be inferred from this evidence is that the reputation possessed by these parties, as to their status, was not general and uniform, but was far from being so. It cannot be said that they were generally regarded as being husband and wife.

[2-4] The burden was on plaintiffs, who affirm that the marriage was contracted, to establish that it was. Powers v. Charbmury's Ex'rs, supra; McConnell v. City of New Orleans, 16 La. Ann. 410. In our opinion, the evidence adduced fails to establish the marriage. It is not disputed that Brusseau and Leonise at the commencement of their relations lived in concubinage. This illicit relation, so long as they lived together, is presumed to have continued until the contrary is made to appear. Thus, it is said in 38 Corpus Juris, p. 1328, that:

"If intercourse between persons of opposite sex was illicit in its inception because of their failure to enter into a marriage, * * * it is presumed to continue so, and the burden of proving a subsequent intermarriage rests on the party asserting it."

See, also, note to Becker v. Becker, L. R. A. 1915E, p. 77.

We also think that the fact that Brusseau and Leonise were of different color militates with considerable force against the contention that they were married. Thus, in 38 C. J. p. 1340, it is said that:

"It is generally held that the presumption (referring to the presumption of marriage arising from cohabitation and repute) is dispelled by reason of the disparity of the parties in race or color, although it may be reinforced by proof of facts sufficient to establish the marriage."

[5] In our view, the fact that the relations between Brusseau and Leonise were indisputably illicit in the beginning, and openly and notoriously so in the community in which they lived, when coupled with the fact that the parties were of different color, makes it highly improbable that they were ever married. The fact that some in the community regarded them as married, while others did not, does not create a presumption of marriage. Reputation, to give rise to such a presumption, although coupled with evidence showing long cohabitation, must be general and consistent. Powers v. Charbmury's Ex'rs, 35 La. Ann. 630. See, also, note to Grigsby v. Reib, L. R. A. 1915E, p. 39 et seq. In our opinion, the evidence as a whole fails to establish the marriage, and we must therefore rule that it was not contracted.

Since it does not appear that Brusseau and Leonise were married, it follows that no community of acquets and gains existed between them. Hence Leonise did not acquire an undivided half interest in the land in controversy as a member of such a community. As Leonise was not Brusseau's wife, and as it is not even contended that she was related to him, it also follows that she was not his heir, and therefore inherited nothing from him. Hence it does not appear that plaintiffs have title to the property or to any part of it.

But plaintiffs urge that this is an action to establish title, and that, while their proof may not be such as to entitle them to recover in a petitory action, yet if they have shown such color of title as is superior to the title defendants have shown, they should recover, and cite in support of their position Atchafalaya Land Co. v. Brownell-Drews Lumber Co., 130 La. 657, 58 So. 500, Ann. Cas. 1913C, 1358.

This suit was instituted as one to establish title, under allegations to the effect that neither plaintiffs nor defendants were in actual possession of the property. The suit was not excepted to on the ground that defendants were in actual possession, and we find no evidence that any one was in such possession when the suit was filed. We shall therefore view the action as one to establish title, and pass upon the relative merits of the titles at issue herein, so far as may be necessary, to determine this appeal from that standpoint.

In passing upon the case from the standpoint mentioned above, it is unnecessary, we think, to go any further than to ascertain whether Brusseau, at his death, left any legitimate relations. Mrs. Ann Turner, who testified that she is Brusseau's sister, also testified that her father and mother were married at some place in Canada, unknown to her, somewhere about 1825 or 1826. The evidence also shows that several children were born in Canada of the union so testified to; that about 1834 or 1835 the parents moved to St. Lawrence county, N. Y., where they resided with their children, and where several other children were born to them, including Riley A. Brusseau and Mrs. Turner, who is one of the witnesses in this case, and who is the only one of the ten children now alive. The father died in St. Lawrence county about 1854, and the mother died elsewhere in 1869 or 1870. The evidence shows that the parents held themselves out as man and wife, were recognized as such in the community in St. Lawrence county, in which they lived, sent their children to school, so far as they were able, and provided for them. It does not appear that there were any illicit relations between

the parents, or any difference of race or color, both being, we feel safe in holding, of the Caucasian race. It affirmatively appears that their status as husband and wife was not questioned in St. Lawrence county. As to how they were regarded in the community in Canada, where the couple resided for some years, the record does not disclose, but it would not be unreasonable to infer from their conduct in St. Lawrence county that they were regarded in Canada also as husband and wife.

Plaintiffs, however, objected to this evidence and insist that it is not admissible in the absence of a showing that the primary evidence of the marriage was lost or destroyed. Plaintiffs, among other cases, cite in support of their position Green et al. v. New Orleans, S. & G. I. R. Co., 141 La. 120, 74 So. 717, in which the court said, to quote the syllabus which correctly reflects the ruling made, that:

"It would seem to be an elementary proposition under the law as it now stands (since the amendment, in 1855, of Civ. Code, art. 107 [now article 105], whereby the duplicate act of marriage, for which the article provides, is required to be returned, with the duplicate license, to the officer issuing the license, and by him recorded), that, in any case in which it is sought to prove a contract of marriage, the proponent should be required to produce a certified copy of the public records, which the law declares shall be made, of the contract, and that, until it be shown that the record has been lost or destroyed, no secondary, or inferior, evidence thereof, offered to create a presumption that such contract had been entered into, should be received."

[6] It does not appear what the laws of that part of Canada, where the marriage is said to have been contracted, are, as regards the essentials to the validity of a marriage, and we take it that we are expected to presume, in the absence of such a showing, that the laws in such part of Canada are the same as they are here, regarding the requisites to the validity of marriages. If we are to indulge in such a presumption it is only fair

and proper that we presume that the laws in Canada, in this respect, were the same as they were here at the time the marriage was contracted. So presuming, whatever may be said as to the ruling in the Green Case, especially in so far as it apparently assumes that a license is necessary to a valid marriage, such was not the law in this state at the time the alleged marriage, here under consideration, was contracted. The law at that time is stated in Holmes v. Holmes, 6 La. 470, 26 Am. Dec. 482, as follows:

"Our Code does not declare null a marriage not preceded by a license, and not evidenced by an act signed by a certain number of witnesses and the parties; nor does it make such an act exclusive evidence of a marriage. These laws relating to forms and ceremonies, here regarded as directory to those alone who are authorized to celebrate marriages, are intended to guard against hasty and inconsiderate marriages in defiance of parental authority. Like all other contracts, it may be proved by any species of evidence not prohibited by law, which does not presuppose a higher species of evidence within the power of the party; and cohabitation as man and wife, furnishes presumptive, evidence of a preceding marriage. It is not to be presumed those who hold themselves out in society as man and wife, who are rearing a family of children at their domestic board, to whom the father gives his name, over whom he exercises a parent's authority, and administers a parent's protection and support, are living in open disregard of public morals, and that their common offspring are bastards; such a family is already in the possession of a civil condition or status, not to be questioned lightly and collaterally. * * *"

[7] Presuming, therefore, that the law in Canada was the same as it was here at the time it is contended that the marriage was contracted, it would seem that a license and an act or return signed by the parties and the witnesses were not necessary there to the validity of a marriage, and hence that parol evidence, such as that offered by defendants, is admissible to establish the marriage without showing the loss or destruction of that which was not essential to its validity.

[8] In our opinion, the evidence offered

was admissible and is sufficient to show that the marriage was contracted, and hence that the children born thereof, including Riley A. Brusseau, are legitimate.

[9] If, however, in point of fact, no marriage was contracted in Canada, still this would not result, under the circumstances, in our having to hold that even those of the children born in that country remained illegitimate. The laws of New York, concerning the matter under inquiry, have been proved by depositions and by introducing in evidence decisions of the courts of that state. The law there, under the facts stated above, relating to the relations and conduct of Brusseau's parents, while residing in St. Lawrence county, N. Y., presumes, as it did when they were residing there, that they freely exchanged consent to become husband and wife, and by reason of such exchange of consent and their subsequent living together as man and wife, made them such, and as a consequence of the marriage, thus entered into, legitimatized those of their children born out of wedlock. In re Grande's Estate, 80 Misc. Rep. 450, 141 N. Y. S. 535, and (though not offered in evidence, but cited in Grande's Estate) Hynes v. McDermott, 91 N. Y. 452, 43 Am. Rep. 677. Hence, as Brusseau and his brother and sisters were either legitimate or legitimated in the state where they were born or resided, they must be deemed legitimate here. It is needless to say that parol evidence was admissible to establish the common-law marriage in New York in order to show that, if there was no ceremonial marriage in Canada, Brusseau and his brothers are nevertheless legitimate; parol evidence of necessity being admissible to show a common-law marriage.

From the foregoing it appears that Brusseau, at his death, left legitimate brothers and sisters, and therefore relations capable of inheriting from him. All of the brothers are now dead, and only one sister is living. It is unnecessary to inquire into the legitimacy of the descendants of those who are dead, for if it should develop on such an examination that any of them are illegitimate, this would not benefit plaintiffs, but would only show that others of the Brusseau heirs would be entitled to the interest of these, or of their assigns, and none of the Brusseau heirs question the legitimacy of any of the others. We also deem it unnecessary to inquire into the validity of the Watkins tax title to one-half of the tract, for it would not benefit plaintiffs even if it should be declared null, and there is no contest among the various defendants concerning that title in this court.

For the foregoing reasons we are of the opinion that the titles of the defendants, excepting that of the defendant Mrs. De Bouchel, who, as stated, has not appealed from the judgment against her, is superior to that of plaintiffs.

Since the writing of this opinion the appellants have filed a motion to remand the case to admit alleged newly discovered evidence relative to the alleged marriage of Brusseau and Leonise Verdine. Aside from the fact that an end must come to litigation, it may be said that the evidence is merely cumulative, and, moreover, is not sufficient in weight to cause a change of view on our part. The motion is therefore denied.

For these reasons, the judgment appealed from is affirmed.

O'NIELL, C. J., is of the opinion that the plaintiffs proved that Riley A. Brusseau and Leonise Verdine were married, and is, therefore, of the opinion that there should be judgment for the plaintiffs, subject to the right of Mrs. Onezima De Bouchel to appeal from the judgment.