Jack FISHER, Personal Representative of the Estate of Dimitrios Kepessidis, Plaintiff–Appellee,

v.

The AGIOS NICOLAOS V et al., Defendants-Appellants.

Eugenia KEPESSIDIS, Individually, etc., et al., Plaintiffs-Appellees,

v.

The AGIOS NICOLAOS V, etc., et al., Defendants–Appellants.

No. 79–1103.

United States Court of Appeals, Fifth Circuit.

Oct. 10, 1980.

Robert S. DeLange, Galveston, Tex., E. D. Vickery, Houston, Tex., for defendants–appellants.

Dué, Dodson & DeGravelles, Paul H. Dué, Baton Rouge, La., for Eugenia Kepessidis.

Before MORGAN, CHARLES CLARK and TATE, Circuit Judges.

TATE, Circuit Judge:

The surviving widow and dependents of a Greek seaman killed on a foreign vessel in an American port were awarded damages in this wrongful death action, which was brought under the Jones Act and general maritime law. The defendants held liable (the shipowner Valsky, a Liberian corporation, and the ship operator Valmas, a Panamanian corporation) contend principally that the district court erred (a) in failing to grant a motion for dismissal based on forum non conveniens, (b) in applying United States rather than Greek law, and (c) by incorrectly computing the damage award. We find no reversible error and therefore affirm the judgment of the district court.

*FACTS*

The decedent, Dimitrios Kepessidis, a citizen of Greece, was hired in Greece as the chief engineer for the M–V AGIOS NICOLAOS V and joined the vessel in Beaumont, Texas, on May 22, 1976.

The AGIOS NICOLAOS V is a Greek flag–flying and Greek registered vessel owned by defendant, Valsky Maritime, Ltd. (Valsky), a Liberian corporation. It is operated by the defendant Valmas Brothers Shipping, S.A. (Valmas), a Panamanian corporation.[1] The vessel, which had recently been purchased from a Swedish vendor, was the only ship owned by Valsky. The AGIOS NICOLAOS V had sailed to Beaumont (on its maiden voyage under Valsky) without any cargo. Its first business venture (and only one prior to the accident) was to pick up corn at a Beaumont grain elevator and to deliver it to the Soviet Union.

On June 1, 1976, Chief Engineer Kepessidis, who had only nine days earlier joined the crew of the AGIOS NICOLAOS V, had gone to help one of the crew start the engine boilers. They were unsuccessful in three attempts. On the fourth attempt, the boiler exploded, and the decedent was burned. Despite being injured, the decedent proceeded to fight the fire, but the fire extinguisher he used was not in working order. In a further attempt to extinguish the blaze, members of the crew turned on the carbon dioxide system. In doing so, however, no one took a head count, and Chief Engineer Kepessidis was trapped in the engine room, where he suffocated from the carbon dioxide.

We should here note that the defendants do not attack the district court's findings that the decedent's accident and death resulted from the unseaworthiness of the vessel[2] and the negligence of the defendants.[3] While a contention is made that

---

1. The two corporate defendants were owned and operated entirely by three brothers, Nicholas Valmas, Christothis Valmas, and Dimitris Valmas, all of whom were citizens and residents of Greece.

2. The district court found that the defendants' vessel and its equipment were unseaworthy in that the starboard auxiliary boiler had a defective leaking fuel valve and defective equipment, in that the boiler was having to be operated and attempted to be ignited on a manual basis when the equipment was designed to be automatic but which automatic features had broken down and had not been repaired despite reasonable opportunity for such repair, in that the boiler was not equipped with an adequate sight glass or other safety device to accord an operator a reasonable opportunity to inspect the furnace for possible leaking fuel oil, in that the controls, operations manuals, etc., were all in Swedish rather than Greek, and in that the crew was not given proper training and instructions in the proper and safe method to operate

these automatically designed boilers in a manual fashion. The court properly found that this unseaworthiness proximately caused the accident resulting in the death of the late Mr. Kepessidis.

3. The district court found: The defendants were negligent in failing to assure that all fire extinguishers were functioning properly, in failing to see that proper fire drill procedures occurred aboard ship, in resorting to the $CO^2$ system when it was unnecessary to do so, and in causing the $CO^2$ system to be activated before any reasonable steps were taken to ascertain that all engine room personnel had reached safety. The defendants were likewise negligent in that no attempt was made to use fire resistant clothing to reach the engine room to cut off the fuel supply for the fire and to rescue any persons located in the engine room. This negligence caused or contributed to the death of the late Mr. Kepessidis. The defendants were also negligent in causing or permit-

the decedent's own negligence may have been a contributory cause, the trial court's finding to the contrary is far from being clearly erroneous [4] so as to justify our upsetting it on review.[5]

## ISSUES

On appeal, the defendants–appellants raise the following principal issues: (1) Whether the trial court erred in retaining jurisdiction of this suit (a forum non conveniens contention); (2) If jurisdiction were properly retained, whether the district court erred in applying American law rather than Greek law; and (3) Whether the damages were properly computed, in that (a) the award of future loss of earnings was not discounted to present value and (b) prejudgment interest was improperly allowed (or, alternatively, at the wrong rate).

## I. Forum Non Conveniens

The defendants' motions in the trial court did not dispute its jurisdiction of these maritime claims, nor that court's discretion in determining whether the action before it should be conditionally dismissed on forum non conveniens grounds that the Greek courts were a more suitable forum. As we apprehend their argument before us, the ultimate contention of the defendants is that the district court abused its discretion in not dismissing the suit because, in their view, the court was in error under the *Lauritzen* test (see text at note 7 *infra*) in determining that American law applied.

The fountainhead decision in determining application of the forum non conveniens principle is *Gulf Oil Corporation v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947), a non-maritime case. There the Court stated that "[t]he principle of *forum non conveniens* is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." 330 U.S. at 507, 67 S.Ct. at 842. The doctrine "presupposes at least two forums in which the defendant is amenable to process . . . [and] furnishes criteria for choice between them." *Id.* Although "the combination and weight of factors requisite to given results are difficult to forecast or state," 330 U.S. at 508, 67 S.Ct. at 843, among the factors of "private interest" listed by the Court were accessibility of proof and witnesses, enforceability of any resulting judgment, and the ease and expense of litigation in the forum. Such factors allow a court to "weigh relative advantages and obstacles to fair trial." *Id.* A trial court should also look to "public interest" factors such as the burden created for local court calendars and local juries by trials having no connection with the forum. The Court stressed that "[t]he doctrine leaves much to the discretion of the court . . . But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Id.*

In the exercise of discretion to retain jurisdiction of maritime tort suits, the Unit-

---

ting the various unseaworthy conditions as set forth to exist and in failing to provide plaintiffs' decedent with a safe place to work, which negligence proximately caused the accident resulting in the death of Mr. Kepessidis.

**4.** The defective leaking valve caused a residue of gas to build up after each unsuccessful attempt to ignite the boiler. Relying on expert evidence that the decedent should have allowed a minute or two to elapse (so as to allow the gas to dissipate) after each unsuccessful attempt, the defendants contend that the decedent's fault contributed to the accident. We find no error in the district court finding that the decedent could not have reasonably known of the defect so as to take such precaution and did not act without reasonable care for his own safety under the circumstances; as well as its

conclusion that the decedent's relatively minor burns would not have resulted in his death, which was due to carbon dioxide suffocation brought about by the negligence (bordering on gross) of the defendants.

**5.** The district court's findings of fact in an admiralty case are binding unless clearly erroneous. Fed.R.Civ.Proc., Rule 52(a). In a judge trial of an admiralty claim, questions of negligence and proximate cause are treated as fact questions and a finding of fact of the trial court on these issues will not be overturned on review unless clearly erroneous. *Marcona Corporation v. Oil Screw Shifty III*, 615 F.2d 206, 208 (5th Cir. 1980), *S. C. Loveland, Inc. v. East West Towing, Inc.*, 608 F.2d 160, 166 (5th Cir. 1979).

ed States Supreme Court early stated that "[the] jurisdiction . . . will [be] exercise[d] . . . unless special circumstances exist to show that justice would be better subserved by declining it." *The Belgenland v. Jensen*, 114 U.S. 355, 367, 5 S.Ct. 860, 865, 29 L.Ed. 152 (1885). In this circuit, this standard for the exercise of this trial court discretion in resolving forum non conveniens contentions has been reiterated in these terms:

> [T]he question is not whether an injustice will result if the court does not exercise jurisdiction, but whether exercising jurisdiction will result in an injustice . . . Under the proper standard, the court must begin with the assumption it will exercise jurisdiction unless it is established, by the defendant, that an injustice would follow.

*Poseidon Schiffahrt, G. M. B. H. v. The M/S Netuno*, 474 F.2d 203, 205 (5th Cir. 1973), vacating a forum non conveniens dismissal. See also *Motor Distributors, Ltd. v. Olaf Pedersen's Rederi A/S*, 239 F.2d 463 (5th Cir. 1956), *cert. denied*, 353 U.S. 938, 77 S.Ct. 816, 1 L.Ed.2d 760. *See* Comment, The Convenient Forum Abroad Revisited: A Decade of Development of the Doctrine of Forum Non Conveniens in International Litigation in the Federal Courts, 17 Va.J. Int.L. 755, 764 (1977).

■ Reviewing the district court's exercise by this standard of its discretion to retain jurisdiction, we find no abuse. Even aside from the district court's correct determination that American law applies (which

dictates rejection of a forum non conveniens dismissal, see part II of this opinion below), we would be unable to hold that the trial court discretion was abused when it retained jurisdiction, based upon such factors here present as: the accident having occurred in a United States port, with investigations having been undertaken by American agencies (the coast guard and the local fire department) and medical authorities; American counsel having been retained, with substantial steps toward adjudication having already been undertaken; the joinder with the maritime tort claims of a bona fide wage claim arising under American law; and the substantial issue from the onset of the litigation as to whether American or Greek law [6] applied to this accident. Thus, even if Greek maritime–injury law (see note 6) was ultimately decided to be applicable, we cannot say the trial court abused its discretion by retaining jurisdiction and denying a forum non conveniens dismissal.

■ We do not find persuasive the defendants' forum non conveniens arguments. First, they state that the trial court's refusal to find *Lauritzen* factors alone determinative as to this issue presents an error of law or a clearly erroneous factual determination; but they overlook that these choice–of–law factors, while perhaps relevant since American law's application ends further inquiry (see II below), are not determinative as to forum non conveniens as *Lauritzen* itself states.[7] Second, the de-

---

**6.** Even if Greek law applied, a substantial showing is made by the plaintiffs' Greek–law expert that, in the event the death was caused by the defendants' gross negligence or failure to comply with a safety regulation, the plaintiffs' claim for maritime tort damages would be governed by the law of the place where the tort occurred, i. e., the United States.

**7.** *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953). The decision essentially concerned a choice of law issue: Whether the American Jones Act could afford a claim for personal injury suffered in a Cuban harbor by a Danish seaman on a Danish flag vessel. The decision attempted to list the factors appropriate to influence the choice of whether American instead of foreign law was to govern

a maritime tort claim. See Part III of opinion below.

The courts sometimes base the application or not of a forum non conveniens dismissal of a seaman's suit on *Lauritzen* factors. See, e. g., *Anastasiadis v. S. S. Little John*, 346 F.2d 281 (5th Cir. 1965). However, the *Lauritzen* court itself recognized that the forum non conveniens factor of the inaccessibility of a foreign forum "might be a persuasive argument for exercising discretionary jurisdiction to judge a controversy", but that the choice of law issue involved different considerations. 345 U.S. at 589–90, 73 S.Ct. at 932. The court in *Alegria v. Grand Bassa Tankers, Inc.*, 337 F.Supp. 401 (S.D.N.Y. 1971) correctly summarized the question thusly: "The doctrine of *forum non conveniens* should not be applied to the instant cases. De-

fendants argue that the *Belgenland* standard for retaining jurisdiction ("unless special circumstances exist to show that justice would be subserved by declining it," 114 U.S. at 367, 5 S.Ct. at 865) applies only to collisions between foreign vessels and not to suits by a foreign seaman against a foreign vessel or owner [8]–a distinction for which no citation is offered, which has never been noted in the doctrinal literature,[9] and which has been ignored in decisions retaining jurisdiction over suits by foreign seamen against foreign ship parties.[10]

■ An appellate court reverses the decision of a district court on a motion to dismiss on forum non conveniens if it constitutes a clear abuse of discretion. *Fitzgerald v. Texaco, Inc.*, 521 F.2d 448, 451 (2nd Cir. 1975), *cert. denied*, 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976); *Paper Operations Consultants International, Ltd. v. S. S. Hong Kong Amber*, 513 F.2d 667, 670 (9th Cir. 1975); *The Kanto Maru*, 112 F.2d 564, 565 (9th Cir. 1940). Having found

no such abuse, we affirm the district court's retention of jurisdiction.

## II. *Choice of Law as a Factor in Forum Non Conveniens Decision*

The defendants have argued their forum non conveniens contentions on the basis of choice of law considerations, as if the latter supplied an interchangeable test for both issues. Some observations about the interplay of forum non conveniens and choice of law considerations might therefore be appropriate.

*Lauritzen v. Larsen* (discussed in III *infra*) is the fountainhead decision in determining choice of law principles to govern suits brought in American courts by foreign seamen against foreign shipping interests. *Lauritzen*, in reversing the lower courts' determination that the American Jones Act rather than a foreign compensation law governed, indicated that a forum non conveniens consideration was not relevant in

---

fendants, in relying upon *Lauritzen v. Larsen* . . . and its progeny, have misconceived the holding in that case which dealt with the 'factors which . . . are generally conceded to influence *choice of law* . . . .' We are not dealing here with choice of law but with a choice of forum, and *Gulf Oil Corporation v. Gilbert* . . . is the applicable authority rather than *Lauritzen v. Larsen*." Id. at 403. See also *The Fletero v. Arias*, 206 F.2d 267 (4th Cir. 1953), which recognized that the *Belgenland* forum non conveniens discretion applies to a seaman's suit for maritime injuries, although *Lauritzen* applies as to the distinctly separate choice of law (Jones Act) issue.

The chief relevance of the *Lauritzen* factors to a forum non conveniens decision is that if the choice is *American* law, it would rarely, if ever, be appropriate to relegate the foreign seaman to a foreign forum, see II, *infra*, and no decision has been found so doing.

**8.** . The defendants rely upon the court's statement in *Belgenland* that "the case of foreign seamen is undoubtedly a special one when they sue for wages under a contract which is generally strict in its character and framed according to the laws of the country to which the ship belongs; framed, also, with a view to secure, in accordance with those laws, the rights and interests of the shipowners as well as those of master and crew, as well when the ship is abroad as when she is at home. Nor is this special character of the case entirely absent when foreign seamen sue the master of their ship for ill–treatment. On general principles of

comity, admiralty courts of other countries will not interfere between the parties in such cases unless there is special reason for doing so . . . ." 114 U.S. at 364, 5 S.Ct. at 864. In context, the statement referred to situations where foreign law (then) clearly applied, as compared with the general maritime law found to be applicable in *Belgenland* (and thus a reason for retaining jurisdiction). When the law of a non–American forum clearly applies, this is of course a relevant factor for the application or not of forum non conveniens principles. The defendants' argument really addresses itself to the issue of whether the district court was correct in holding that the American law rather than Greek law applied.

**9.** Bickel, The Doctrine of Forum Non Conveniens as Applied in the Federal Courts in Matters of Admiralty, 35 Cornell L.Q. 12 (1949); Morrison, The Foreign Seaman and the Jones Act, 8 Miami L.Rev. 16, 17–18 (1953); Comment, A New Look at *Lauritzen v. Larsen*, Choice of Law and Forum Non Conveniens, 38 La.L.Rev. 957 (1978); Note, The Convenient Forum Abroad Revisited, 17 Va.J.Int.L. 755, 764–66 (1977).

**10.** See, e. g., *Conte v. Flota Mercante del Estado*, 277 F.2d 664 (2nd Cir. 1960) (Argentine law applied); *The Fletero v. Arias*, 206 F.2d 267 (4th Cir. 1956) (Argentine law applicable); *Heredia v. Davies*, 12 F.2d 500 (4th Cir. 1926).

the determination of the choice of law, even though it "might be a persuasive argument for exercising discretionary jurisdiction to judge a controversy." 345 U.S. at 589–90, 73 S.Ct. 932.

■ To the contrary, however, choice of law factors are relevant in the determination of a forum non conveniens issue. This is so, because one of the factors favoring non –retention of jurisdiction is the application of foreign law to the controversy, which is less convenient for American courts to apply than it is for the courts of that foreign country. *Gulf Oil Co. v. Gilbert*, 330 U.S. 501, 509, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947); *DeMateos v. Texaco, Inc.*, 562 F.2d 895 (3rd Cir. 1977).

■ Thus, where by application of the *Lauritzen* factors the correct choice of law decision is to apply *foreign* law (and a foreign forum is accessible), a district court's discretion in granting a forum non conveniens dismissal will not ordinarily be disturbed on review. *DeMateos v. Texaco Inc., supra; Anastasiadis v. S. S. Little John*, 346 F.2d 281, 284 (5th Cir. 1965); *but see Gkiafis v. Steamship Yiosonas*, 387 F.2d 460 (4th Cir. 1967). On the other hand, despite the choice of a foreign law as applicable, the district court's rejection of a forum non conveniens plea and its retention of jurisdiction will not be disturbed on review in the absence of a clear abuse of its discretion in the matter. See decisions cited at note 10 *supra.* Thus, once it is determined that foreign law clearly applies, it is then appropriate to apply forum non conveniens standards in determining whether

to retain jurisdiction acquired over a maritime suit with foreign factors. *DeMateos v. Texaco, Inc., supra.*

■ However, for similar forum non conveniens reasons, if United States law *is* applicable, the American court should retain jurisdiction rather than relegate the controversy to a foreign tribunal. Thus, for instance, in *Antypas v. Cia. Maritima San Basilio, S.A.*, 541 F.2d 307 (2nd Cir. 1976), the Second Circuit found that "[w]here the Jones Act applies, . . . a district court has no power to dismiss on grounds of *forum non conveniens.*" *Id.* at 310. See *Bartholomew v. Universe Tankships, Inc.*, 263 F.2d 437, 443 (2nd Cir.), *cert. denied*, 359 U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1030 (1959); *Mattes v. National Hellenic American Line, S.A.*, 427 F.Supp. 619, 629 (S.D.N.Y.1977). Because the consequences of a decision that American law applies are so conclusive on the issue, it has in fact been suggested that the initial inquiry in determining a forum non conveniens issue in a maritime case should be centered around the choice of law question.[11]

### III. *Choice of Law: American or Greek?*

The choice of law issue is posed as follows: The plaintiffs contend that the American Jones Act and general maritime law as administered by United States courts furnish the substantive rules for determining liability and damages. The defendants contend that Greek law, furnishing a workmen's compensation type remedy, is instead applicable. The plaintiffs alternatively contend that, if Greek law *does* furnish the rule of decision, then under the present

11. Comment, A New Look at *Lauritzen v. Larsen*, Choice of Law and Forum Non Conveniens, 38 La.L.Rev. 957, 958 (1978):

The mere fact that a suitor is a foreign seaman does not bring into play the doctrine of forum non conveniens. Foreign seamen's suits broadly fall into two categories: those which involve a cause of action based on the laws of the United States and those which do not. Forum non conveniens as applied to foreign seamen is properly concerned only with the latter class of cases, those in which a foreign seaman has no cause of action based on the laws of the United States. When a foreign seaman has a cause of action

based on the laws of the United States the seaman comes by right into the courts and the retention of his suit based on domestic law should be mandatory. Retention of the suit is not discretionary, because once the scope of United States law has been defined the judiciary is not free to adjudicate selectively the effects of the law. Therefore, the object of judicial inquiry at the outset of a foreign seaman's suit is to determine the applicable law, and only if United States law is found not to govern the suit should the appropriateness of the United States forum be examined.

circumstances of the defendants' gross negligence, the law of Greece would allow an action, upon the maritime tort, in which the determination of the substantive issues is decided in accordance with the law of the place of the tort (i. e., the United States, and its Jones Act and the maritime law as administered by its courts).

When a foreign seaman brings suit against a foreign vessel or foreign shipping defendants, the factors to be examined in determining a choice of whether United States or some foreign law applies, have been set out by the United States Supreme Court in the *Lauritzen–Romero–Rhoditis* trilogy: *Hellenic Lines, Ltd. v. Rhoditis*, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970); *Romero v. International Terminal Operating Company*, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959); *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953).

*Lauritzen* set out seven connecting factors generally regarded as significant, to be listed below, and in the case before it held that the overwhelming preponderance of these factors favored application of the foreign law, thus rejecting the application of the American Jones Act sought by the plaintiffs. *Romero* held that the *Lauritzen* factors applied to the determination of whether "the maritime law of the United States" may be applied, 358 U.S. at 381, 79 S.Ct. at 485, as well as to whether the Jones Act might be applied. *Rhoditis*, the latest of these decisions, expanded on the *Lauritzen* test by stating that its list of seven factors "was not intended as exhaustive" and that the test was "not a mechanical

one." 398 U.S. at 308–09, 90 S.Ct. at 1734. In holding the Jones Act to be applicable, the court noted that to effectuate the liberal purposes of the Jones Act the "real nature of the operation" and "the actual operational contacts that this ship and this owner have with the United States" must be considered 398 U.S. at 310, 90 S.Ct. at 1734–35. The *Rhoditis* gloss on the *Lauritzen* tests indicate that the appropriate application of United States law to the foreign seaman's suit depended on the substantiality of the contacts with the United States of the foreign defendant involved in the transaction. *Lauritzen* noted seven factors as significant for consideration: (1) Place of wrongful act; (2) Law of the flag; (3) Allegiance or domicile of the injured; (4) Allegiance of defendant shipowner; (5) Place of the contract; (6) Inaccessibility of foreign forum; and (7) Law of the forum. *Rhoditis* noted an eighth factor of importance,[12] the shipowner's "place of operations" indicating that otherwise an alien owner with substantial business operations in this country might, by escaping his obligations as a Jones Act "employer", be unfairly advantaged over citizens of this country engaged in the same business. 398 U.S. at 309, 90 S.Ct. 1734.

█ The defendants make an extremely strong case for application of Greek law. They point out that the ship flew a Greek flag and had Greek registry, that the deceased seaman was of Greek nationality and had signed his employment contract in Greece,[13] and that the law of the American forum should not be applied simply because the accident occurred in an American port.

---

**12.** In *Rhoditis* a suit under the Jones Act was brought, as here, by a Greek seaman injured in a United States port aboard a Greek flag vessel owned by a Greek corporation. Under the *Lauritzen* test, four factors favored the defendant shipowner and against the retention of jurisdiction. Yet, since it was determined that the defendant had a substantial base of operations in the United States, the court decided that United States law should apply, despite the fact that the factors delineated in *Lauritzen* would suggest otherwise.

**13.** The contract also included a provision that Greek law and Greek courts would exclusively

determine rights under the employment contract including claims on account of illness or accident. A similar agreement was disregarded as of little relevance in *Rhoditis*, in its determination that the American Jones Act afforded a remedy to a Greek seaman under circumstances similar to the present. Probably due to the disparity in bargaining power between the seaman and his employer, American courts have generally accorded little determinative weight to such contractual choice of law provisions. G. Gilmore and C. Black, The Law of Admiralty 476 (2d ed. 1975).

They also point out that the defendants, although a Liberian corporation (the owner) and a Panamanian corporation (the operator), were owned entirely by three Greek shareholders.[14] They rely additionally upon the circumstance that the decedent's survivors had a remedy (in the nature of workmen's compensation, as in *Lauritzen*) available to them in the Greek courts.[15]

■ The district court held, however, that it was instead appropriate to apply United States law to the consequences of this accident in an American port, to which a seaman had flown to join the vessel, and in which port he had worked during his entire service on the vessel prior to the fatal accident there. In rejecting the defendants' substantial contention that Greek law should be applicable, the district court primarily relied upon as a determinative factor that, prior to the accident,[16] the vessel's entire service under its present ownership, and its entire revenues therefore to be earned, arose from a base of operations in the United States. Under the *Rhoditis* gloss on *Lauritzen* factors, this substantial use of a United States base of operations for the shipping and revenues of the vessel and its owner, together with the other United States contacts (the latter of which

may not by themselves have been sufficient for the purpose), justified the choice of the Jones Act and of general maritime law as administered by American courts as a more appropriate basis for decision than the Greek compensation law. *Rhoditis, supra,* 398 U.S. 308, 90 S.Ct. at 1733 (entire income derived from cargo going to or coming from the United States); *Antypas v. Cia. Maritima San Basilio, S.A.,* 541 F.2d 307, 309–310 (2nd Cir. 1976) (most voyages to or from United States ports); *Moncada v. Lemuria Shipping Corp.,* 491 F.2d 470, 473 (2nd Cir.), *cert. denied,* 417 U.S. 947, 94 S.Ct. 3072, 41 L.Ed.2d 667 (1974) (40% of its voyages were either to or from American ports); *Mattes v. National Hellenic Am. Line, S.A.,* 427 F.Supp. at 619, 624 (S.D.N.Y.1977) (most voyages either originated or terminated in United States ports).[17]

We thus do not find merit to the defendants' argument that the district court erred in its conclusion of *law* that United States law may apply to this foreign seaman's accident in a United States port, where the vessel had a substantial base of operations in the United States and its owners derived substantial revenues from United States trade. Under *Rhoditis* and subsequent ju-

---

**14.** The plaintiffs argue that the Liberian and Panamanian incorporations by the Greek nationals, presumably adopted to avoid application of some Greek laws, should not be selectively disregarded at the option of the defendant corporations, solely urged to require the application of Greek law and to defeat the application of American law to the plaintiffs' claim.

**15.** In arguing that a Greek forum is not accessible, the plaintiffs rely upon expert evidence to the effect that, under Greek law, the domicile of the corporations (not of the stockholders) (see note 14 *supra*) determines personal jurisdiction, and that an agreement between parties to confer jurisdiction on Greek courts (see note 13 *supra*) is not enforceable in Greece.

**16.** From external manifestations as of the time of the accident, the vessel had been purchased primarily to service the American grain trade. The defendants argue that the vessel's post–accident use belied extensive service to and from American courts. However, we agree with the plaintiffs that the post–accident use of a foreign vessel previously used entirely in America should not be determinative as to the applica-

tion or not of American law. But for the accident(s) in an American harbor causing large exposure to damages under American law, the plaintiffs ask, who is to say that the owner and operator might have continued to have the vessel ply to and from American ports in the profitable carriage of American grain cargos?

**17.** Here, under the findings, substantial revenues were derived from a substantial base of operations in the United States. We do not, of course, intimate that doing *any* amount of business in a U.S. port, however minor, is alone sufficient to establish a "substantial base of operations." See *Romero, supra; Manlugon v. A/S Facto,* 419 F.Supp. 550 (S.D.N.Y.1976); *Rodriguez v. Orion Schiffahrts–Gesellschaft Reith & Co.,* 348 F.Supp. 777 (S.D.N.Y.1972). Furthermore, the place of the wrongful act alone being in the United States is an insufficient factor upon which to base retention of jurisdiction. See *Yohanes v. Ayers Steamship Co.,* 451 F.2d 349 (5th Cir. 1971); *Koupetoris v. Konkar Intrepid Corp.,* 402 F.Supp. 951 (S.D.N.Y.1975).

risprudence, there was a sufficient nexus between the defendants and this country so as to justify the application of United States law.

■ The defendants' contention, then, is rather that the district court was clearly erroneous in its factual finding that the vessel had a substantial United States base of operations and thereby derived substantial revenues. See its conclusions of law III and XII (making III a conclusion of fact also). The district court's determination that a shipowner has or has not a substantial base of operations in the United States is a factual finding that should not be disturbed on review unless clearly erroneous. *Fitzgerald v. Liberian S/T Chryssi P. Goulandris*, 582 F.2d 312, 315 (4th Cir. 1978). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *U. S. v. U. S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *Dresser Industries v. Fidelity & Cas. Co. of N. Y.*, 580 F.2d 806, 807 (5th Cir. 1978).

■ So tested, we cannot find reversible error. The AGIOS NICOLAOS V had proceeded directly to a United States harbor from Spain upon its purchase by the defendant Valsky, the only vessel owned by that corporation.[18] After its purchase, the vessel proceeded without a cargo directly to a United States port for the purpose of carrying a cargo of American grain to Russia, and the trial court might reasonably have found that it had been purchased for the purpose of such trade. Its entire business activity prior to the accident had been in the United States. The decisions relied upon by the appellant are factually distinguishable as involving less substantial United States operations and contacts in the operation of the vessel.

Since we have found no error in the district court's conclusion United States law applies, we need not reach the plaintiffs' alternative contention: Even if American law were not applicable under the *Lauritzen–Rhoditis* tests, the Greek law–if applicable to the present accident–would still require a determination by reference to American law. In making this contention, the plaintiffs rely upon the testimony of an expert witness relative to Greek law. He testified that, in circumstances of either gross negligence or of a breach of safety regulations causing injury (as plaintiffs state is here present, see factual summary in footnotes 2 and 3 *supra*), a Greek seaman injured in a foreign port on a Greek vessel has a tort action under Greek law that is governed by the place of the tort (i. e., here, the American harbor).

### IV. *Computation of Damages*

■ Finally, the defendants contend that, at any rate, the district court erred (a) in its failure to discount future earnings to present value and (b) with regard to prejudgment interest allowed on the entire record. However, we ultimately hold that any errors in calculation are harmless (if erroneous), because in clear error the district court likewise computed earnings at 750 *dollars* instead of at 750 *British pounds* (worth $1,350) per month. Any erroneous allowance was thus cancelled out (see IV(c) *infra*) by the diminution in the awarded damages resulting from this erroneous calculation based on dollars instead of pounds. *International Paper Company v. Busby*, 182 F.2d 790, 793 (5th Cir. 1950).

#### (a) *Failure to discount future earnings*

The district court awarded $108,800 to the decedent's widow and child. Of this amount, $13,750 is for loss of contributions

---

**18.** The plaintiffs additionally rely in brief upon the purchase of the vessel having been financed through a United States bank branch. See *Gomez v. Karavias*, 401 F.Supp. 104, 107 (S.D. N.Y.1975). The defendants do not in brief contest this finding, but the full deposition to which record citation is made is not in the appellate record. The excerpts from this deposition furnished for the record by the defendants are ambiguous as to this contention.

prior to judgment, and $95,050 for *future loss of contributions*.[19]

In refusing to discount to present value the decedent's loss of future earnings, *Johnson v. Penrod Drilling Company*, 510 F.2d 234, 237 (5th Cir. 1975) (en banc), the district court specifically found that "the future earnings discounted would not more than equal the increase in earnings that the deceased in all probability would have received in the future had he lived and worked his full remaining worklife."

The defendant contends that discount for such reason is not permissible unless the record contains evidence that such future increase in earnings would most probably have been granted in recognition of performance and experience, rather than upon *Johnson*–prohibited inflationary factors alone. *Higginbotham v. Mobil Oil Corporation*, 545 F.2d 422, 434–35 (5th Cir. 1977). In countering this contention, the plaintiffs rely upon deposition testimony considering the decedent's superiority as a worker, his steady advancement over the years, his attending school in 1975 to receive specialized training for purposes of even further advancement in his profession as chief engineer, and the increase in his salary as a chief engineer of over 25% in the last five years of his life. The defendants contend, however, that it is not ascertainable from this evidence the extent to which cost–of–living increases, rather than the individual's own performance and experience had contributed, to the more recent increases in the salaries paid him. Because of an error in calculation undercompensating the plaintiffs, we find the error (if any) harmless. See IV(c) *infra*. We therefore need not resolve this issue.

### (b) *Prejudgment interest*

■ (1) The defendants correctly point out an error in the calculation of the district court's award. Prejudgment interest was allowed on a loss of future earnings

awarded (as to which, of course, no loss by delay in paying had been caused at the time of judgment). *Doucet v. Wheless Drilling Co.*, 467 F.2d 336, 339 n.2 (5th Cir. 1972); *Petition of the City of New York*, 332 F.2d 1006 (2nd Cir. 1964); *Hamilton v. Canal Barge Company, Inc.*, 395 F.Supp. 978, 992 (E.D.La.1975). Nevertheless, in view of an error in calculation to the prejudice of the plaintiffs, this error is harmless. See IV(c) below.

■ (2) The defendants also argue that the appropriate annual rate of prejudgment interest in Texas is 6% instead of the 9% awarded. Pretermitting the issue of the district court's admiralty discretion to allow under some circumstances a greater rate than the statutory rate prevalent in the state, *In re Vulcan*, 553 F.2d 489 (5th Cir. 1977), another panel of this court has recently, after examination of the conflicting Texas authorities, concluded that the trial court did not abuse its discretion in awarding 9% prejudgment interest as appropriate under *state* law in a non–admiralty claim. *Dallas–Fort Worth Regional Airport Board v. Combustion Equipment Associates, Inc.*, 623 F.2d 1032, 1040–1042 (5th Cir. 1980) (syllabus 14). We find no abuse of discretion here.

### (c) *Harmless error*

In its finding of fact, the district court stated that the decedent was paid "a monthly wage of $750 and a yearly wage of $9,000," and calculated the decedent's loss of earnings on this basis. However, the use of the *dollar* figure for monthly wages was clearly erroneous, since the uncontradicted testimony shows that the decedent was paid in British pounds at a rate of 750 pounds per month, see Exhibit P–2 and Transcript of evidence, II, pp. 54, 105, cf. Astifidis dep. p. 48, and that at the applicable time the exchange rate was 1.8176 dollars to the

---

**19.** The decedent's *annual salary* was found by the district court to be $9,000. Of this amount, $3,000 was the amount found that decedent would spend for his own needs, $500 for his parents, and the remaining amount ($5,500) for his widow and child. The award was based on decedent's life expectancy of 19.8 years.

pound, Tr. II, p. 57—or approximately $1,350 per month or $16,200 annually.[20]

If the computation of earnings loss had been correctly calculated on the basis of British pounds instead of dollars, the amounts actually awarded by the district court would have closely approximated the amounts that the plaintiffs were entitled to be awarded on the basis of the district court's findings. See Appendix attached to this opinion, which sets forth the detailed computations. The district court's errors in calculation therefore cancelled out any prejudice claimed by the defendants, since the plaintiffs were undercompensated to the same extent, and the errors, if any, are harmless. See *International Paper Company v. Busby*, 182 F.2d 790, 793 (5th Cir. 1950).

### Conclusion

For the reasons set forth above, we AFFIRM the district court judgment.

### APPENDIX

The trial court computed the *loss of contributions* based on decedent's salary of $750 per month. However, the testimony clearly established that the decedent's monthly income was 750 British pounds. (Expert testimony established that the applicable exchange rate was 1.8176 dollars to the British Pound Sterling.)

In using the $750 a month figure, the trial court calculated decedent's yearly income at $9,000. Finding that decedent would spend approximately one-third on himself, the court found the remaining $6,000 would be spent by decedent for the benefit of his wife and child, in the yearly amount of $5,500, and his parents, in the yearly amount of $500. (The amount to his parents—total of $5,000 to each—appears to have already been discounted to present value.)

Based on the widow and child receiving $5,500 yearly, the court multitipled this figure by the life expectancy of the deceased. The total loss of contribution to the widow and child was found to be approximately $108,800. The trial court then granted prejudgment interest on the entire amount at 9% for 2.5 years (time between death and judgment) and failed to discount it. Therefore, the ultimate award (including prejudgment

interest) for *loss of contributions* totaled $133,280. The trial court failed to discount any portion of this award.

As stated .in the body of the opinion, the trial court erred in granting prejudgment interest on future earnings awarded, as well as possibly by failing to discount to present value that portion attributable to future loss of support. Nevertheless, when the damages are properly recalculated by computing the decedent's monthly salary at 750 British pounds, the trial court's computation, if erroneous in these regards, was harmless.

At 750 pounds per month, decedent's monthly salary was approximately $1,350. Decedent's yearly salary, therefore, would be $16,200. Of this amount, decedent would under the district court's findings use one–third ($5,400) yearly for himself, $500 per year for his parents, and the remaining $10,300 for his widow and child.

Accepting the defendants' allocation as appropriate for discount computation, the decedent's life expectancy will be attributed as follows: 2.8 years from death to date of judgment and 17.0 years post–judgment.

The loss of contribution to his widow and child prior to date of judgment, then, is $28,840 (2.8 × $10,300). Prejudgment interest at 9% should be allowed on this amount. The interest on this is rounded to $2,596. Hence, prejudgment loss of contributions should have been calculated by the trial court to be $31,436, including interest.

Accepting the defendants' contention that discount was appropriate, post–judgment loss of contribution should have been calculated as follows: $10,300 per year × 17 years, discounted to present value at 7½% (the then prevailing rate in the community for federally issued certificates of deposit). The post–judgment loss of contribution would be $97,170. See Gushee, Financial Compound Interest & Annuity Tables, 1942. Thus, the total loss of contributions to widow and child, utilizing a 7½% discount value, was $128,606.

However, the trial court stated that, if it *did* discount to present value (as it ultimately did *not*), it would use a 6% interest rate. Tr. III, p. 445. If such a discount rate were used, the total (discounted) loss of contributions to the decedent and the widow would be as follows: prejudgment, $31,436; post–judgment, $107,913; total, $138,349. See Gushee, *supra*.

In conclusion the trial court actually awarded the widow and child, for loss of contributions, the amount of $133,280 (including prejudgment interest), based upon its erroneous use of a monthly salary for the seaman of 750 dollars instead of 750 British pounds (i. e., $1,350 monthly). If the amount were recomputed correctly by using the

**20.** In calculating earnings on a twelve month basis, the district court rejected the defendants' argument that a lesser work year of 7.6 months per year should be allowed. The argument was based upon the decedent's average work–year during the five years prior to his death. The evidence shows, however, that the decedent

had gone to school to become a diesel chief engineer for a part of those five years, Astifidis dep. pp. 24, 25, 39; that in that interval he had worked continuously for 14 months and 14 days, *Id.* at pp. 20, 21; and that Greek seamen receive annual bonuses totalling approximately 2½ months salary, Tr., II, pp. 106–108.

decedent's accurate monthly income (750 British pounds, i. e., $1,350), the trial court award would be between $128,606 (discounted at the $7\frac{1}{2}\%$ contended for by the defendants) and $139,349 (discounted at 6%, the rate held to be proper by the trial court, if any discount were allowable).

Accordingly, the error of the district court in the computation of damages was harmless error.

AFFIRMED.