511 So.2d 771 (1987)
Dimitrios Theodoros MIHALOPOULOS
v.
WESTWIND AFRICA LINE, LTD. and Southern Star Shipping Co., Inc.
No. 87-CA-103.
Court of Appeal of Louisiana, Fifth Circuit.
June 1, 1987.
*773 Robert H. Murphy, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, Risley C. Triche, Triche, Sternfels & Nail, Napoleonville, for Westwind Africa Line, Ltd., defendant and appellant.
C. John Caskey, Baton Rouge, Gordon Crawford, Gonzales, for Dimitrios Theodoros Mihalopoulos, plaintiff and appellee.
Before BOWES, GAUDIN and WICKER, JJ.
BOWES, Judge.
Plaintiff Dimitrios Theodoros Mihalopoulos (hereinafter called Jimmy) obtained a judgment in the Twenty-Third Judicial District Court, Parish of St. James, in his maritime action against the defendant, Westwind Africa Line, Ltd. (hereinafter Westwind) in the amount of one million one hundred twenty-five thousand dollars ($1,125,000.00). Jimmy was seriously injured while employed as a seaman aboard the M/V DESERT PRINCE, owned by Westwind. Westwind has appealed the jury verdict and judgments, averring (among other issues) that the trial court erred in its resolution of the maritime question of choice of the correct applicable law and that the jury verdict awarding damages was excessive. Liability of Westwind was not contested on appeal. Jimmy answered the appeal, alleging several errors, which will be addressed hereinafter.
Jimmy originally obtained jurisdiction in St. James Parish by obtaining a writ of attachment against the vessel M/V DESERT PRINCE while the ship was within the parish. Various procedural actions later took place concerning the attachment which do not concern us here. The case reached this court twice on writ applications, one of which is pertinent and will be addressed in due course. The problem of "choice of law" arises under the following circumstances.
Jimmy was a Greek citizen at the time he signed to serve aboard the M/V DESERT PRINCE, as well as at the time of his injury. Westwind is a Liberian corporation; however, the M/V DESERT PRINCE, like most of the other ships of the line, flies a Greek flag.
At this point, it should be noted that Southern Star Shipping Company is a New York corporation which acts as the general agent for Westwind in the United States; Southern Star was originally a defendant but was dismissed as a party prior to trial.
The accident took place in Boulogne, France, when a scaffolding in which Jimmy was being lowered to the dock became unhooked from its crane and fell. Jimmy, now a resident of Canada, had signed an employment contract in Greece, in which it was agreed that "any differences arising from this contract are exclusively under the jurisdiction of the Greek Courts of Piraeus, excluding under any circumstances the competency of any Foreign Court." Despite the multiplicity of foreign connections, Jimmy successfully sued for damages under the United States maritime law, specifically under the Jones Act, and the maritime doctrine of unseaworthiness. Westwind has consistently maintained throughout the action that Greek law is applicable in the present case, and continues to so urge on appeal. At first blush, this argument sounds plausible but, as we shall see, the well is much deeper than it appears to be.

*774 Choice of Law

The primary defense of Westwind has been that plaintiff, under the above facts and circumstances, should not be entitled to recover full tort damages under the Jones Act, 46 U.S.C. Sec. 688 and United States General Maritime Law.
In this regard, Westwind has alleged that the district court's application of United States law to this case is manifestly erroneous, an abuse of discretion, and that the court erred in failing to give effect to the choice of law clause in the contract between plaintiff and defendant.
In his answer, plaintiff has urged that it was error "for the civil jury below to have been submitted interrogatories on choice of law." Plaintiff refers to the determination made by this court on a writ application filed by defendant just prior to the original trial date. The trial court had ordered that all issues regarding choice of law, including all factual issues implicit therein, be tried by the court without a jury. In granting the writ, a panel of this court stated:
The right to trial by jury has been held to be a procedural matter. Carter v. City of New Orleans, 327 So.2d 488 (La. App. 4 Cir.1976); Simler v. Conner, 372 U.S. 221, 83 S.Ct. 609 [9 L.Ed.2d 691] (1963). Therefore, the laws of Louisiana relating to jury procedures are applicable herein. Accordingly, under La. C.C.P. art. 1735, the defendant shall be afforded a jury to determine the facts upon which the choice of law decision is to be made by the trial judge.
We find nothing in plaintiff's argument on appeal to convince us that our prior ruling is incorrect and we hold it is now the "law of the case" and should be so applied. This principle applies to all decisions of an appellate court, not merely those arising from the full appeal process. See Brumfield v. Dyson, 418 So.2d 21 (La. App. 1 Cir.1982). The application of this doctrine should not be applied where to do so would accomplish an obvious injustice, or where the former appellate decision was clearly, palpably, or manifestly erroneous. Brumfield, at p. 22. We find no such situation or error here and decline to reconsider the question any further.
Turning to the defendant's assignment of error, we are directed to the Lauritzen-Rhoditis-Romero trilogy of cases, which deal with the choice of law issue as decided by our United States Supreme Court.
In Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), the court considered seven factors in determining that a Danish seaman injured in Havana harbor on a Danish vessel was not entitled to the benefit of the Jones Act protection.
Those factors, briefly, are:
1. Place of the wrongful act
2. Law of the flag (of the ship)
3. Allegiance or domicile of the injured person
4. Allegiance of the defendant shipowner
5. Place of the contract
6. Inaccessibility of a foreign forum
7. Law of the forum
Romero v. International Terminal Operating Co., 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), extended the consideration of these factors to claims under general maritime law such as an action for unseaworthiness.
Hellenic Lines, Ltd. v. Rhoditis, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970) added an eighth factor  the shipowner's base of operations. The federal courts have varyingly interpreted and weighed these eight points. Indeed, the court in Rhoditis emphasized that the Lauritzen test was not a mechanical one: "The significance of one or more factors must be considered in light of the national interest served by the assertion of Jones Act jurisdiction."
Of the various factors, the one most widely open to interpretation, and consequently the most difficult to determine, is the eighth "base of operations" issue. It is that particular factor which is primarily contested in the present case.
After all witnesses, except one, had finished testifying in the trial, counsel for plaintiff and defendant entered into a stipulation, *775 which was read into the record. The following facts were characterized as uncontested:
"The place of the wrongful act was France;
The law of the flag was Greece;
The allegiance or domicile of the injured party at the time of the accident was Greece;
The allegiance or domicile of the injured party following the accident is Canada;
The allegiance of the ship owner is Liberian;
The place where the contract of employment was executed is Greece;
The foreign forum is accessible.
The law of the forum is the United States;
There is a general agent in the United States;
Ship financing in the United States, banking line of credit in the United States, ship mortgage in the United States;
Agent for service of process in the United States;
The president chairman of the board of directors is a U.S. citizen;
The president chairman of the board of directors lives and works in the United States;
There's line cargo service to the United States;
The seaman Plaintiff signed aboard the vessel in the United States;
The board of director ... there are board of director meetings in New York;
The ship owner has been Plaintiff in lawsuits brought in the United States;
The president chairman of the board of the ship owner is president of Southern Star Shipping, Inc.;
The Liberian Articles of Incorporation of the ship owner were written in English and originally executed in Monrovia, and amended subsequently in New York;
The president chairman of the board of the ship owner personally guarantee debts of the ship owner;
Most voyage files of West Wind Africa Line, Limited are kept in the United States."
The case was submitted to the jury with six interrogatories concerning issues of fact which apparently were considered by the parties as contested. The interrogatories, and the jury's answers, were:
1. Did Westwind Africa Lines, Ltd., have a base of operations in the United States at the time of plaintiff's injury?
 Answer, Yes or No Yes
2. Did Westwind Africa Lines, Ltd., have a base of operations in Greece at the time of plaintiff's injury?
 Answer, Yes or No Yes
3. Was the ultimate control or ownership of Westwind Africa Lines, Ltd. by United States citizens?
 Answer, Yes or No No
4. Were the crews of the ships of Westwind Africa Lines, Ltd. paid from funds transferred from the United States?
 Answer, Yes or No Yes
5. Were there any business reasons for Westwind Africa Lines, Ltd. flying Greek flags on their ships?
 Answer, Yes or No No
6. What nation do you find to be the principal base of operations of Westwind Africa Lines, Ltd. in its operation of the M/V DESERT PRINCE?
 Answer: Greece
The jury did not have the benefit of the stipulated facts to assist them in their deliberations. In our opinion, the stipulations greatly clarified some otherwise confusing and conflicting testimony regarding the choice of law determination, and we are unable to fathom why such enlightening details were kept from the knowledge of the fact-finding body.
Nevertheless, the trial judge had to consider the stipulations, as well as the jury's findings, and, in so doing, found that United States law should be applied, but gave no real reasons for his finding. In our view, despite the contradictions between some of the jury's findings and some of the stipulations, the trial judge reached the correct determination in deciding that United States law should be applied.
The law is well settled that a determination of choice of law by the trial court is reviewed by the appellate courts "de novo." Diaz v. Humboldt, 722 F.2d 1216 *776 (5 Cir.1984); Sosa v. M/V Lago Izabal, 736 F.2d 1028 (5 Cir.1984); Pereira v. Utah Transport, Inc., 764 F.2d 686 (9 Cir.1985); Koke v. Phillips Petroleum Co., 730 F.2d 211 (5 Cir.1984); Phillips v. Amoco Trinidad Oil Co., 632 F.2d 82 (9 Cir.1980). Black's Law Dictionary (5th Edition 1979) defines the term "de novo": "Anew; afresh; a second time." A "de novo trial" is defined as "Trying a matter anew; the same as if it had not been heard before and as if no decision had been previously rendered." Therefore, we do not feel it necessary to discuss the jury's answers and findings, because of the confusion and conflict noted above. Nevertheless, we do not feel that the jury's answers to the interrogatories, taken in toto, necessarily indicate that a different decision on the choice of law question should have been made by the trial judge.
We turn now to the considerations and jurisprudence which bring us to the conclusion that we should affirm the learned trial judge in his decision to apply United States law in this case.
The United States Fifth Circuit, in Fisher v. Agios Nicolaos V, et al., 628 F.2d 308 (5 Cir.1980), involved a Greek seaman injured in the United States on a ship flying a Greek flag under Greek registry, who had signed his employment contract in Greece. The defendant shipowner was a Liberian corporation and the ship operator was a Panamanian corporation, both of which were owned entirely by three Greek shareholders. In affirming the application of the district court of American law, the 5th Circuit noted:
In rejecting the defendants' substantial contention that Greek law should be applicable, the district court primarily relied upon as a determinative factor that, prior to the accident,16 the vessel's entire service under its present ownership, and its entire revenues therefore to be earned, arose from a base of operations in the United States. Under the Rhoditis gloss on Lauritzen factors, this substantial use of a United States base of operations for the shipping and revenues of the vessel and its owner, together with the other United States contacts (the latter of which may not by themselves have been sufficient for the purpose), justified the choice of the Jones Act and of general maritime law as administered by American courts as a more appropriate basis for decision than the Greek compensation law. Rhoditis, supra, 398 U.S. 308, 90 S.Ct. at 1733 (entire income derived from cargo going to or coming from the United States); Antypas v. Cia. Maritima San Basilio, S.A., 541 F.2d 307, 309-310 (2nd Cir.1976) (most voyages to or from United States ports); Moncada v. Lemuria Shipping Corp., 491 F.2d 470, 473 (2nd Cir.), cert. denied, 417 U.S. 947, 94 S.Ct. 3072, 41 L.Ed.2d 667 (1974) (40% of its voyages were either to or from American ports); Mattes v. National Hellenic Am. Line, S.A., 427 F.Supp. at 619, 624 (S.D.N.Y. 1977) (most voyages either originated or terminated in United States ports). [emphasis ours]
(The additional U.S. contacts were that the seaman was flown to the American port to join the vessel, in which port he had worked during his entire service on the vessel prior to the accident.) The Court, further interpreting Rhoditis, declared:
The Rhoditis gloss on the Lauritzen tests indicate that the appropriate application of United States law to the foreign seaman's suit depended on the substantiality of the contacts with the United States of the foreign defendant involved in the transaction. Fisher, supra.

In 1984, the 5th Circuit considered the "base of operations" issue again in Sosa v. M/V Lago Izabal, supra. A Mexican seaman was injured in the Houston Ship Channel, aboard a ship of Mexican registry. In affirming application of American law, the court, in examining the applicable factors, noted:
we do not "merely add up the scores for and against, for the test is neither arithmetic nor mechanistic." DeOliveira v. Delta Marine Drilling Co., 707 F.2d 843, 845 (5th Cir.1983) (on rehearing). The trial court's choice of law is reviewed *777 by us de novo. Diaz v. Humboldt, 722 F.2d 1216, 1218 (5th Cir.1984).
The court continued:
We have held that an American base of operations is shown when a foreign owner is engaged in extensive business operations in this country. Diaz, 722 F.2d at 1218. The necessary operational contacts with the United States must relate to both the shipowner and the ship, Fajardo v. Tidewater, Inc., 707 F.2d 858, 862 (5th Cir.1983), and must be substantial, Diaz, 722 F.2d at 1218.
In Sosa, the M/V LAGO IZABAL regularly loaded cargo in Houston; all operations for management of the vessel were conducted out of a Houston office; actual maintenance of the vessel was performed in Houston; the vessel's shipping agent was a corporation located in Houston. These factors were considered in determining that the defendant shipowner had a U.S. (Houston) base of operations.
An important consideration for determining the base of operations is the location at which day-to-day operating activities are conducted. Diaz v. Humboldt, supra. The Diaz court declined to apply American law where the shipowner maintained no office or representative in the United States and managed its daily operations from outside the United States. While the owner used American husbanding agents, "the mere use of such agents or brokers who contract in American ports for the use of the ship's services is insufficient to establish an American base of operations."
... Nor does the fact that Naviera Humboldt's vessels have called at United States ports support a finding of an American base of operations. The mere fact that a vessel periodically visits this country is insufficient to establish such a base.
The stipulations, as well as the testimony, clearly establish that Westwind had more than a mere "husbanding" agent in the United States, and that its vessels did not merely, periodically, visit the United States, but had a line cargo service to the United States, and that cargo (manganese, iron ore, and grain) was shipped to and/or from this country on a regular basis.
Westwind had obvious, substantial, and continuous connections with the United States. We agree with plaintiff that a base of operations need not be the "principal" base in order to justify imposition of United States substantive law under the cited jurisprudence. In determining the import of the "base of operations" factor, the analysis is one of "extensive business operations." Rhoditis, supra.
It is further significant that, although subpoenaed for use at the trial by subpoena duces tecum, as well as for discovery, defendant did not produce its stockholder or stock transfer records, nor was the failure to produce justified, or properly explained. When they were called for at the trial, counsel for Westwind simply stated he did not have them. It was Westwind's position that there was only one stockholder and so there were no such books. Why a stockholder book was not necessary, even if there was only one stockholder, was never explained. Mr. Emmanuel Kavoussanakis, a vice-president and member of the Board of Directors of Westwind, testified via deposition (only excerpts of which were read into the record) that Mrs. Flora Coumantaros, widow of the deceased John Coumantaros (the original founder) owned 100% of the stock. However, no record of the settlement of the estate of John Coumantaros or any evidence of the sole ownership of all the stock devolving upon Mrs. Flora Coumantaros (instead of to the wife and children) was ever produced. Under Louisiana law, the wife and children would have inherited the stock, absent a will, which was not shown, and, in the absence of any evidence to the contrary, the presumption is that Greek law is the same as ours. See Doiron v. Vacuum Oil Co., 164 La. 15, 113 So. 748 (1927). However, as to whether there were any transfer books, Mr. Kavoussanakis simply said, "I don't know if we have any."
It strains credulity to state that a corporation such as Westwind has no record of its shareholders, particularly in view of *778 such requirements in the company's by-laws as:
"All certificates of stock shall be consecutively numbered, and the name of the persons owning the share represented thereby, together with the number of such shares and the date of issue, shall be entered on the books of the company."
Defendant's Exhibit # 4, By-laws of Westwind Africa Line, Limited, Article VI, Section 1.
Another glaring and most significant factor to the detriment of Westwind is that, with the exception of the excerpts from the deposition given by Mr. Kavoussanakis, they failed to produce at trial a single administrative officer or any management personnel who were knowledgeable about the management and/or overall operations or policies or records of the shipowner. Instead, the "official representative" of the company was an individual "port captain" who emphasized repeatedly in his testimony that he was not a member of the management of the company and that he could not address questions concerning overall operations of the company.
It is well-settled that where a litigant fails to produce evidence or witnesses available to him and no reasonable explanation is made therefor, the presumption arises that the production of such evidence or witnesses would have been unfavorable to his cause. See Cox v. Cadaro, 484 So.2d 177 (La.App. 5 Cir.1986) and authorities quoted therein.
In Dalla v. Atlas Maritime Co., 771 F.2d 1277 (9 Cir.1985), the court construed defendant's refusal to identify the owners of the vessel against defendant stating: "... the judge applied common sense and concluded that the vessel's owners are United States nationals." We find a similar situation exists here. Considering the stipulations concerning George Coumantaros, the president/chairman of the Board of Directors, who obviously wields great control of the corporation, and the failure of Westwind to produce witnesses and evidence under their control to the contrary, we conclude that Westwind has not proven that all of the stock, or even the controlling interest thereof, is held by Greek citizens. We further conclude that the effective and realistic control of the corporation is in the hands of United States residents. If not, the corporation could easily have proven otherwise simply by producing their subpoenaed stock register or other convincing evidence.
In Sosa, supra, the Court said:
[Aside from the American place of wrongful act and base of operations,] we note that over 90% of Tracey's stockholders were United States residents; we look through the facade of foreign incorporation to the American ownership behind it. [emphasis supplied]
We are aware of the maxim enunciated in Lauritzen, supra that the law of the flag is an important consideration. However, the fact that this particular ship, of many owned by the defendant, flew the Greek flag (others flew Liberian flags), did not change the overall operations management or base of operations of Westwind Africa Line, Ltd., the corporation who is the defendant herein; and the cases which followed Lauritzen and enlarged seaman's rights to sue under the Jones Act or for unseaworthiness in a United States court, as enunciated above, have placed less and less emphasis on the law of the flag as a determinative factor.
We find the facts that the United States is a substantial base of operations of the defendant, and that realistic and/or actual control and operation and/or ownership of Westwind is by American residents (and/or American citizens), outweigh the fact that the ship in question flew a Greek flag. As the Supreme Court stated in Rhoditis, supra:
We see no reason whatsoever to give the Jones Act a strained construction so that this alien owner, engaged in an extensive business operation in this country, may have an advantage over citizens engaged in the same business by allowing him to escape the obligations and responsibility of a Jones Act "employer." The flag, the nationality of the seaman, the fact that his employment contract was Greek, *779 and that he might be compensated there are in the totality of the circumstances of this case minor weights in the scales compared with the substantial and continuing contacts that this alien owner has with this country. If, as stated in Bartholomew v. Universe Tankships Inc., 263 F.2d 437 [2 Cir.1959] the liberal purposes of the Jones Act are to be effectuated, the facade of the operation must be considered as minor, compared with the real nature of the operation and a cold objective look at the actual operational contacts that this ship and this owner have with the United States.
In general, we adopt that same philosophy in this case and our reasons are even stronger because George Coumantaros, the president/chairman of the Board of Directors, is, by stipulation of the parties, an American citizen. Additionally, we do not interpret the clause in the seaman's contract to mandate application of Greek law, but it appears rather to be an attempt at a choice of a forum, especially by the party who formulated the contract (obviously Westwind). It does not appear that we are involved in a question of jurisdiction or forum non conveniens. Therefore, we do not find the contract determinative of any issues before us.
Accordingly, we affirm the decision of the trial judge in his wisdom to apply United States law.

Damages
Defendant urges on appeal that the amount of damages awarded by the jury was excessive; plaintiff counters that they were inadequate.
Immediately following the accident, Jimmy was paralyzed from the chest down. He suffered an impaction-fracture of the first lumbar vertebra, a fractured rib, a fracture of the pubic bone, and a severe fracture of the left elbow. His primary injury was to his spinal cord at the T 12, L 1 level. Two days after the accident, he underwent a laminectomy and osteosynthesis. This was done, to stabilize his spine, by using 2 plates and 8 screws, to stop the motion in his broken back. A second operation was performed two days later, due to a complication. A large section of bone was removed to evacuate blood and any remaining bone fragments around the spinal cord.
While still hospitalized in France, Jimmy became so depressed that he attempted to commit suicide. He had to wear diapers for 3 months, and use a catheter to urinate for 4 months (which resulted in a severe infection). He testified he had been in pain every day for two years, and that he often felt it would have been better if he had died.
Jimmy was transferred to New York University Medical Center under the care of Dr. Ragnarsson with a diagnosis of paraplegia. (Jimmy has relatives in Canada, who began to help with his care and with whom he still resides.) He could ambulate with assistance (a walker) and made some gains, regaining partial function of his legs and could eventually walk with a cane. A few months later, Jimmy moved to Montreal where his treating physicians were Doctors Gordon and Fish.
In Montreal, another operation was performed to remove the "hardware" inserted in France. At the time of trial, Jimmy wore a back brace and a leg brace on his right leg to control spasms. He is unable to walk or stand for more than 20-30 minutes at a time without resting. He has a significant loss of feeling in his right leg; this presents danger because he can burn or cut himself and remain unaware of any injury; there is a less severe sensory loss in the other leg. His treating physician found that Jimmy had improved as much as he ever would, and that future surgery was probable.
It is medically impossible for Jimmy to do any work requiring heavy lifting, dexterity on his feet, or good balance. He is not a functional walker. He suffers sexual dysfunction and bladder incontinence (nocturia). His treating physician testified that he is disabled for any type of job, because his injury makes him a poor employment risk. Mr. Frank Edwards, a vocational rehabilitation specialist, testified that Jimmy had a low average I.Q., functioning on about a third grade math level. He is a *780 slow learner who has heretofore used his body to earn his living, as a farmer, truck driver, and seaman. Therefore, his physical injury leaves him with no "transferable" or marketable skills. There is no market for the types of jobs he could perform, except for some below-minimum wage employment in a charitable-type "shelter." However, no availability of such a job was proven at trial.
The witnesses produced by defendants did not successfully refute plaintiff's evidence as to his physical injuries, or his present disabilities. The rehabilitation specialist and vocational psychologist testifying for Westwind did not have sufficient bases for their conclusions. For example, Dr. Feldbaum did not have the benefit of Dr. Gordon's (plaintiff's surgeon) reports; while he typically evaluates English-speaking individuals on personality tests regarding their capacity to sustain gainful employment, "I did not do it in this case due to the fact I wouldn't know how to interpret personality tests of a Greek gentleman."
The only economist to testify was Dr. George Rice. He determined that at the time of the accident, Jimmy had a work-life expectancy of 26.8 years. There were several methods of calculating past and future lost wages, complicated by the fact that Jimmy had been paid, prior to his accident, in Greek drachmas and was a Greek citizen. He is now a North American resident, living in Canada; however, the wage calculation had to be translated into United States currency, and by an acceptable method considering inflation (as is usually the case in such calculations).
Dr. Rice opined, according to a generally accepted economic formula that he used, and described in his testimony, that the present value of past lost wages, using a straight "American" conversion from drachmas to dollars, was $17,376.00; future lost wages calculated in the same manner amounted to $156,511.00. Converting the "buying power" of the drachma into the "buying power" of the dollar, the value of past and future lost wages was then calculated. Dr. Rice analyzed the situation by using a standard of an American seaman on an American ship "to show the jury his relative purchasing power and what it would take to replace it." The present value of future lost wages was computed by Dr. Rice by using a standard discount rate, giving a present value of $347,454.00 of future lost wages without considering overtime; since Jimmy had consistently worked overtime, that factor was later taken into consideration; the present value of future lost wages was then figured at $597,872.00. Using the same method, past lost wages were figured at $66,376.00. An additional sum of $99,848 was given as the value of lost fringe benefits, called the "found", common to the seaman, such as medical benefits, meals, and sleeping quarters, aboard a ship.
Defendant offered no expert economic witnesses and no alternative methods of calculation, except to ask Dr. Rice to figure an amount of dollars that Jimmy would have earned, at the same rate of pay at the time of the accident, and/or to take into consideration what difference it would have made in the figures if Jimmy had continued to work on his mother's farm in Greece a few months out of the year (as he had done) for the rest of his life. Obviously, Jimmy is not obligated to do this. These calculations did not consider inflation, or guaranteed annual increases and other variable factors, and would have "frozen" Jimmy at the present rate as of the day of his injury. We do not find these to be a viable or realistic alternative calculation. In summary, Westwind relied upon "cross-examination" instead of offering its own economic expert, and we do not find the results persuasive.
The jury's award was not divided into amounts for loss of wages, pain and suffering, etc. We cannot determine what figures the jury considered for such categories. However, considering the devastating physical injuries suffered by plaintiff in the past, and the physical, emotional, psychological, and realistic economic losses he presently suffers and will endure in the future, for apparently as long as he lives, we do not find the damage award to be *781 excessive. Indeed, we have been offered no alternative by defendant. In addition, our reviewing authority in such cases has been severely limited by our State Supreme Court:
State appellate review of jury awards under maritime law and the Jones Act is, as in the federal courts, "extremely limited." They must stand unless the appellate courts find there is no law and no evidence to sustain them, rendering them, as some courts have put it, so excessive as to be obviously punitive, motivated by prejudice, passion, partiality, or corruption.

Trahan v. Gulf Crews, Inc., 260 La. 29, 255 So.2d 63 (1971)
We find the law and the evidence sustains the jury verdict, and that it is not punitive nor prejudicial, etc. Therefore, the jury judgment of $1,125,000.00 is affirmed.

PRE-JUDGMENT INTEREST
Defendant has alleged that the district court erred in awarding plaintiff interest from the date of judicial demand, rather than from the date of judgment. Plaintiff's original petition demanded legal interest from the date of the loss or, alternatively, from date of judicial demand. After trial, the question of interest was not submitted to the jury, and the verdict does not mention that interest was intended to be included.
It is settled that pre-judgment interest is not recoverable in Jones Act cases tried to a jury. Barrios v. Louisiana Construction Materials Company, 465 F.2d 1157 (5 Cir.1972); Sanford Bros. Boats, Inc. v. Vidrine, 412 F.2d 958 (5 Cir.1969). Pre-judgment interest is awarded almost as a matter of course in cases tried to a judge under general maritime principles such as unseaworthiness. Wyatt v. Penrod Drilling, 735 F.2d 951 (5 Cir. 1984). When a general maritime claim is tried solely to the jury, award of pre-judgment interest is an issue for the jury. Havis v. Petroleum Helicopters, Inc., 664 F.2d 54 (5 Cir.1982). When a Jones Act claim is tried jointly with the maritime claim before a judge, interest may be awarded at the trial court's discretion. Ceja v. Mike Hooks, Inc., 690 F.2d 1191 (5 Cir.1982).
However, the prevailing view under Federal law is that in jury cases, in which a Jones Act claim is tried together with an action for unseaworthiness, plaintiff is not entitled to any pre-judgment interest unless the jury apportions the damages between the Jones Act claim and the unseaworthiness claim. Wyatt, supra. In actions at law when the award of interest is discretionary, it is the jury who must exercise such discretion and grant such interest. Robinson v. Pocahontas, Inc., 477 F.2d 1048 (1 Cir.1973). The latest expression of this position of the Federal Courts is McPhillamy v. Brown & Root, Inc., 810 F.2d 529 (5 Cir.1987):
As the judgment now stands, McPhillamy is not entitled to prejudgment interest because the jury awarded damages on the Jones Act and unseaworthiness claims without allocating its award between the claims. The plaintiff is not entitled to any prejudgment interest in cases such as this unless the jury apportions the damages between the Jones Act claim and the unseaworthiness claim.
"... the granting of pre-judgment interest in these cases is a matter of federal substantive law.... The issue is one of fact and should have been presented to the jury for its consideration." Morris v. Schlumberger, Ltd., 436 So.2d 1178 (La. App. 3 Cir.1983). We agree that the granting of interest is clearly substantive, and not a procedural issue as urged by plaintiff. Therefore, we are obliged to apply federal substantive law, as outlined above.
Consequently, because the jury was not asked to consider an award of pre-judgment interest, nor did it grant such, and because the claims were not divided by the jury into Jones Act and unseaworthiness claims, it was manifest error for the trial judge to add such interest to the jury award from date of judicial demand.
The cases cited by plaintiff, in which no apportionment of awards were required by *782 Louisiana courts, involved cases tried before a judge, and therefore are not applicable to our inquiry.
For the foregoing reasons, the judgment of the trial court is revised, insofar as it awards plaintiff interest from the date of judicial demand, to reflect that interest shall accumulate on the award at the rate prescribed by law only from date of judgment, July 22, 1986. All costs of the appeal are assessed to appellant, Westwind Africa Line, Ltd.
REVISED, AND, AS REVISED, AFFIRMED.
GAUDIN, J., dissents with written reasons.
GAUDIN, Judge, dissenting.
I respectfully dissent, being of the opinion that Greek rather than American maritime law should have been applied.