# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 21, 2011

Lyle W. Cayce
Clerk

No. 11-30413
Summary Calendar

CHAD DAVID LEDET,

Plaintiff–Appellee

v.

SMITH MARINE TOWING CORPORATION,

Defendant–Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:10-CV-1713

Before REAVLEY, SMITH, and PRADO, Circuit Judges.

PER CURIAM:[*]

At issue in this case is Plaintiff–Appellee Chad Ledet's recovery from injuries sustained while working as a deckhand aboard the M/V SMITH HUNTER, a sea-going tug owned by Defendant–Appellant Smith Marine Towing Corporation ("Smith Marine"). Because we do not find clear error in the district court's finding that Ledet was not contributorily negligent nor in its damage award, we AFFIRM.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-30413

## I. FACTUAL AND PROCEDURAL BACKGROUND

The facts, as found by the district court, are as follows.

On October 17, 2009, Ledet was assigned to the SMITH HUNTER, a sea-going tug owned by Smith Marine. The crew working with Ledet on that date consisted of Captain Randy Martin, Relief Captain Todd Delaune, and Sean Martin, Captain Martin's son. The SMITH HUNTER was towing an unloaded offshore deck barge, the Tideland No. 21, from a dock near Amelia, Louisiana to the Eugene Island Sea Buoy in order to release it to the awaiting HARVEY INVADER, a substantially larger tug. The Tideland No. 21 was equipped with its own towing equipment, or "chain bridle," which consisted of two chains attached to its front corners connected by a "fishplate" and a pendant wire that extended from the fishplate to the SMITH HUNTER. The "socket" of the pendant wire was attached to the "hard eye" of the SMITH HUNTER's "snatch line" by a "shackle." The snatch line is a double rope connected to the SMITH HUNTER'S towing wench, which is located in the center stern of the vessel. A "shackle" is a metal device that can be opened and closed. Captain Martin testified that the Tideland No. 21's chain bridle made it different from the barges he had towed on other occasions. In other instances, the tug's towing gear attached directly to the barge, without the use of a pendant wire.

Before arriving at the Eugene Island Sea Buoy, Captain Martin, Ledet, and Sean Martin convened for a joint safety analysis (JSA), during which they discussed the method for releasing the Tideland No. 21 and its towing equipment to the HARVEY INVADER. Captain Martin instructed Ledet and Sean Martin that they would retrieve the Tideland No. 21's pendant wire to a point where it would be positioned over the stern deck of the SMITH HUNTER. Captain Martin would then have one of the deckhands insert the SMITH HUNTER's starboard norman pin into its holster at the extreme stern of the vessel. A norman pin is a four-foot medal rod that sticks up two to three feet from the grating in the stern of the vessel when in place. Once the norman pin was inserted, Captain Martin would pivot the vessel so that the Tideland No. 21's pendant wire was resting against the norman pin and then instruct the deckhands to tie the pendant wire to the norman pin. The purpose of securing the pendant wire was to allow Martin to create slack in the pendant wire and the snatch line so that the two could be

2

unshackled. During the JSA, there was a miscommunication as to which rope Captain Martin intended for the deckhands to use when tying the pendant wire. Captain Martin wanted the pendant wire tied with a soft, nylon rope that Sean Martin had prepared for that purpose, but Captain Martin did not specify that to Ledet.

After the pendant wire was attached to the norman pin, the deckhands—while standing on the port side of the vessel—would then disconnect the shackle linking the Tideland No. 21's pendant wire to the SMITH HUNTER's snatch line. Once the shackle was disconnected, the deckhands would then throw a 100-foot line attached to the Tideland No. 21's towing gear to the HARVEY INVADER from the starboard side of SMITH HUNTER, allowing the HARVEY INVADER's crew to pull the barge's towing gear onto that vessel.

At the JSA, Ledet proposed an alternate method for disconnecting the Tideland No. 21's towing gear that he had seen used by other captains. Ledet suggested using the SMITH HUNTER's anchor drum wire, or "suitcase wire," to secure the Tideland No. 21's pendant wire during the transfer. The suitcase wire is attached to the anchor drum, which is a small wench located directly below the towing wench in the center stern of the vessel. Under Ledet's plan, the suitcase wire, which is outfitted with a "pelican hook," would have been attached to the pendant wire with a second shackle, or "slider," placed behind the pendant wire's socket. The suitcase wire would have been used to "suck up" the pendant wire to a point where the crew could disconnect it from the shackle connecting it to the snatch line. Captain Martin rejected Ledet's proposal to secure the pendant wire with the suitcase wire because tying the pendant wire to the norman pin would take less time.

The SMITH HUNTER arrived at the Eugene Island Sea Buoy at approximately 2:30 a.m. Ledet was sleeping in his cabin, and Sean Martin woke him up so that Ledet could assist with the transfer. At the time, the sea conditions were somewhat rough, with three-to five-foot waves and wind at 20 to 25 miles per hour. Captain Martin was in the "doghouse" on the starboard side of the vessel, which provided him with a bird's-eye view of the stern deck, and he was equipped with a PA system that allowed him to be heard by the deckhands.

No. 11-30413

Ledet exited the interior of the vessel from the back door on the port side. On his way out, he grabbed a plastic rope hanging near the door. Ledet then approached the norman pin from the port side and used the plastic rope to tie the Tideland No. 21's pendant wire to the norman pin. Ledet then walked around the bow of the SMITH HUNTER in order to get to the starboard side, where he waited underneath the doghouse. Sometime after, Martin used the PA system to order Ledet to tie the pendant wire to the norman pin using the nylon rope that Sean Martin had prepared. By then, Sean Martin had placed the nylon rope on the starboard grating in the stern of the vessel, adjacent to the norman pin. Following [Captain] Martin's orders, Ledet approached the norman pin from the starboard side. When Ledet reached the starboard grating, the vessel dipped in the trough of a wave, and the pendant wire came untied and slipped over the norman pin, striking Ledet, throwing him against the vessel's bulwarks, and knocking him unconscious. At that time, the HARVEY INVADER was pulling up on the starboard side of the SMITH HUNTER and was not yet parallel to the vessel. Although Ledet understood that the starboard side of the vessel was a "pressure zone" or "danger zone" until the pendant wire was released from the snatch line, he testified that he thought there was slack in the pendant wire at the time Captain Martin ordered him to tie the pendant wire to the norman pin with the nylon rope. Martin also testified that it was his intention to keep slack in the line once the pendant wire was tied to the norman pin.

. . .

After the accident, Sean Martin awoke Relief Captain Todd Delaune. Delaune left his sleeping quarters and exited onto the deck from the port side of the vessel. Delaune then proceeded to jump over the snatch line, which was then slack, to reach the starboard side, where Ledet had been thrown by the pendant wire against the bulwarks. Delaune administered first-aid to Ledet and assisted him into the galley. Delaune then went back on deck to unshackle the Tideland No. 21's pendant wire and transfer it to the HARVEY INVADER from the starboard side. By that time, the HARVEY INVADER had pulled alongside the SMITH HUNTER, which kept the SMITH HUNTER from bouncing in the waves. As a result, the towline was slack on the deck, and Delaune was able to make the transfer quickly without securing the pendant wire.

No. 11-30413

*Ledet v. Smith Marine Towing Corp.*, No. 2:10-CV-1713, 2011 WL 1303918, at *1–3 (E.D. La. Apr. 4, 2011) (footnotes omitted).

When the SMITH HUNTER returned to land, Ledet was taken to the hospital where he underwent a CT scan which indicated that he had suffered a compression fracture to his L1 vertebra. A few days later, Ledet went to see Dr. Brian Chaisson, who diagnosed Ledet with compression fractures to both his T12 and L1 vertebrae, gave Ledet a back brace, and prescribed him pain medication. A subsequent MRI confirmed Chaisson's diagnosis of fractures to both T12 and L1. About a month after the accident and after wearing the back brace all day, every day without any reduction in pain, Ledet went to see a pain specialist, Dr. Socrates Zapata Campusano. Campusano also diagnosed Ledet with T12 and L1 vertebral fractures as well as edemea. Campusano advised Ledet of two strategies to try to combat the pain: kyphoplasty (surgery involving attachment of cement to stabilize compressed vertebrae) or epidural streoid injections to control the pain and decrease inflammation around the area of the trauma. Ledet chose the injections. Because of lingering pain even after receiving the injection, Campusano referred Ledet to Dr. Arthur Ulm, a neurosurgeon. Ulm prescribed Ledet additional pain medication (Lortab).

After four months of conservative, pain-management-focused treatment, Ulm recommended that Ledet undergo a laminectomy. Ledet's laminectomy was a three-level surgical fusion of his T11 to L2 vertebrae. The surgery helped Ledet to a degree, but he still experienced a substantial amount of pain following the surgery. By June 27, 2010, Ledet's final visit to Ulm, Ulm had concluded that Ledet's fusion and implants were successful but that "his response with regards to pain has been less than satisfactory." Ledet's options going forward were to either have an internal pain pump installed or to continue controlling his pain through oral pain medication.

5

No. 11-30413

Ledet sued Smith Marine on June 10, 2010 in the Eastern District of Louisiana.  Ledet sought damages pursuant to the Jones Act, 46 U.S.C. §30104 (2006), and general maritime law for injuries he sustained during the October 17, 2009 accident aboard the SMITH HUNTER.  A bench trial was held on February 7 and 8, 2011.  On April 4, 2011, the district court entered judgment in favor of Ledet, in the amount of $1,894,728.39—$373,863 in future wage loss; $300,000 past pain and suffering; $1,000,000 in future pain and suffering; $219,379.30 in future medical expenses; and $1,486.09 in additional maintenance.  Smith Marine timely appealed, seeking remittitur and review of the district court's finding that Ledet was not contributorily negligent.

## II.  STANDARD OF REVIEW

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo."  *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 601 (5th Cir. 2000).  We will only reverse based on clear error if:

> (1) the [district court's] findings are without substantial evidence to support them, (2) the court misapprehended the effect of the evidence, and (3) although there is evidence which if credible would be substantial, the force and effect of the testimony, considered as a whole, convinces the court that the findings are so against the preponderance of credible testimony that they do not reflect or represent the truth and right of the case.

*World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 752 (5th Cir. 2009) (citations omitted).  For example, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  *Anderson v. City of Bessemer*, 470 U.S. 564, 572 (1985).  Embodied in this standard is significant deference to the district court.  This deference is even greater when the factual findings are "based on the credibility of witnesses."  *Tokio Marine & Fire Ins. Co. v. FLORA MV*, 235 F.3d 963, 970

No. 11-30413

(5th Cir. 2001) (citing FED. R. CIV. P. 52(a)[(6)]); *Anderson*, 470 U.S. at 575). Additionally, "[i]n a bench tried [maritime] case, a district court's findings concerning negligence and causation are findings of fact." *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 303 (5th Cir. 2008).

A district court's damages award is a finding of fact reviewed for clear error. *Jauch v. Nautical Servs., Inc.*, 470 F.3d 207, 213 (5th Cir. 2006). We only reverse an allegedly excessive award on the "strongest of showings;" that is, when it "exceeds the bounds of reasonable recovery." *LeBron v. United States*, 279 F.3d 321, 326 (5th Cir. 2002) (internal quotation marks omitted). "'We apply the loosely defined "maximum recovery rule" when deciding whether a remittitur is in order. This judge-made rule essentially provides that we will decline to reduce damages where the amount awarded is not disproportionate to at least *one factually similar* case from the relevant jurisdiction.'" *Id.* (quoting *Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336, 1344 (5th Cir. 1990)) (emphasis in original). "The rule does not necessarily limit an award to the highest amount previously recognized in the state; indeed, the rule does not become operative unless the award exceeds 133% of the highest previous recovery in the relevant jurisdiction for a factually similar case." *Id.* (internal quotation marks and alteration omitted). "Because the facts of each case are different, prior damages awards are not always controlling; a departure from prior awards is merited if unique facts are present that are not reflected within the controlling caselaw." *Id.* (internal quotation marks omitted).

## III. DISCUSSION

### A. Comparative Negligence

Smith Marine asserts that Ledet was negligent because he knew that Captain Martin's plan created a pressure zone and that when he stepped forward beyond the "H-beams" he would be in the pressure zone. Nonetheless, Smith Marine contends, Ledet went ahead and entered the pressure zone, where

No. 11-30413

he was injured. On this point, the district court found that Ledet was reasonable in complying with Captain Martin's orders, despite the fact that the plan was "conceptually flawed from a safety standpoint from the get go" because of Captain Martin's "superior vantage point an control of the vessel." *Ledet*, 2011 WL 1303918, at *5. Because the district court found that Ledet was following orders, Smith Marine's argument about Ledet's own negligence is foreclosed by *Williams v. Brasea, Inc.*, 497 F.2d 67 (5th Cir. 1974). There we held that "a seaman may not be contributorily negligent for carrying out orders that result in his own injury, even if he recognizes possible danger." *Id.* at 73 (citation and internal quotation marks omitted). Moreover, as stated above, findings of fact, like that Ledet was not negligent, are even harder to upset when they are based on a credibility determination of the district court. *Tokio Marine & Fire Ins.*, 235 F.3d at 970. The district court specifically found that Captain Martin's testimony was not credible. *Ledet*, 2011 WL 1303918, at *3. Therefore, we find no clear error in the district court's determination that Ledet was not negligent.

## B.    Remittitur

Smith Marine further urges error based on the district court's award of $1.3 million in damages for past and future pain and suffering. Both Smith Marine and Ledet admit that there are relatively few cases from Louisiana involving injuries to the lower thoracic and upper lumbar spine to use as comparitors for the maximum recovery rule. Ledet points us to *Mihalopoulos v. Westwind Africa Lines Ltd.*, 511 So. 2d 771 (La. Ct. App. 1987), as a suitable comparitor. In *Mihalopoulos*, the plaintiff brought a Jones Act suit against his employer for a serious injury he suffered aboard the M/V DESERT PRINCE. *Id.* at 773. The jury awarded Mihalopoulos $1.125 million in damages, including past and future lost wages, which the appellate court affirmed. *Id.* at 780–81. Mihalopoulos, like Ledet, underwent a laminectomy—Mihalopoulos's was a single-level where as Ledet's was a three-level. *Id.* at 779. Mihalopoulos also

8

No. 11-30413

lost his livelihood as a seaman and had to have assistance to walk. *Id*. at 779–80. Admittedly, Mihalopoulos underwent three surgeries, was initially paralyzed, and had other complications such as depression and incontinence—things that Ledet has not experienced. *Id*. at 779. Ledet, however, lives with chronic pain that likely cannot be improved. Even if we subtract out the approximately $750,000 that the economic report in *Mihalopoulos* said were lost wages, there is still a $475,000 verdict in 1987 dollars, which would be about $946,750 today.[1] The Ledet verdict is about 137% of the *Mihalopoulos* verdict.

As additional proof of the verdict's reasonableness, Ledet points to a non-maritime case—*Carrier v. Nobel Insurance Co.*, 87 So. 2d 126 (La. Ct. App. 2002). In this more recent case, the Louisiana Court of Appeals affirmed a $1.159 million award ($850,000 in past and future pain and suffering plus $300,000 in loss of enjoyment of life), *id*. at 133, where the plaintiff, after being injured in a car accident, underwent a one-level lumbar fusion, *id*. at 129. Unlike Ledet, Carrier also had "urinary dysfunction and torn shoulder ligaments," *id*., but did not suffer chronic pain like Ledet does. One hundred thirty-three percent of the $1.159 million award in *Carrier* would be over $1.5 million, which is in excess of the district court's $1.3 million award.

From the "rough guidance" of *Mihalopoulos* and *Carrier*, we find the maximum recovery rule to be inapplicable. *See Moore v. M/V ANGELA*, 353 F.3d 376, 385 (5th Cir. 2003). Smith Marine has provided us with no other basis to upset the district court's award; therefore, we find no clear error in the district court's award and affirm it.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[1] Conversion done using the Bureau of Labor Statistics's CPI Inflation Calculator, *available at* http://data.bls.gov/cgi-bin/cpicalc.pl.

No. 11-30413